Jackie BOLDEN as Administratrix Estate of Alexis Bolden, Denise Gary and Jackie Bolden, Movants/Cross–Respondents,

v.

CITY OF COVINGTON, Respondent/Cross–Movant.

Nos. 90–SC–082–DG, 90–SC–184–DG.

Supreme Court of Kentucky.

Feb. 14, 1991.

Laurie Dowell, Twehues and Verst, New-port, Bruce L. McClure, Florence, for movants/cross-respondents.

Stephen T. McMurtry, Covington, for respondent/cross-movant.

LEIBSON, Justice.

The City of Covington has been found liable to the movants for failure of the Director of Housing Development and city inspectors to enforce certain provisions of the City's Housing Code applying to fire safety violations. The Court of Appeals has reversed the judgment and we have accepted review. The facts are as follows:

On March 8, 1984, one Douglas Durham intentionally firebombed an apartment building located at 814 Scott Street in Covington. Movants, Jackie Bolden and Denise Gary, were tenants occupying Unit # 5 on the second floor. When the fire spread they were compelled to jump from the second floor rear window of their apartment, sustaining injuries, and, further, causing Jackie Bolden to give birth prematurely to a daughter, Alexis Bolden, who later died from complications attendant to prematurity.

The parties stipulated that certain Fire and Safety Codes, and the Housing Code, introduced in evidence, were "in force in the City of Covington from October, 1983 to March 8, 1984," the period of time relevant to our inquiry.

This address at 814 Scott Street is part of row housing, next door to a building numbered 816, sharing a common fire wall. In early October 1983, a Covington Housing Inspector found 110 Code violations at 816 Scott Street. The violations at 816 Scott Street caused it to be placarded as unfit for human habitation following the administrative "Complaint Procedure" set out in § 152.07 in the Covington Housing Code. This "Complaint Procedure" includes in subsection (D) "notice [to the owner] and hearing before the Director of Housing Development" regarding fire and safety violations. If that public officer "determines that the structure under consideration is unfit for human habitation," § 152.07 provides a procedure for "an or-der requiring the owner, within the time period specified, to vacate, repair, demolish, alter, or improve the structure to render it fit for human habitation." The Housing Code also provides a procedure for the owner "after making repairs" to request a "reinspection of the structure" and to appeal "to the Local Board of Housing, Building, and Construction Appeals," if the owner believes his structure is no longer "in violation and unfit for human habitation."

In subsection (F) the Housing Code provides that "[i]f the owner fails to comply with an order of repair ... the Director of Housing Development may cause the structure to be repaired, altered, or improved, or to be vacated, closed, removed, or demolished." If the Director decides to cause the building to be closed, he is directed to post a placard on the main entrance stating in pertinent part that the "building is unfit for human habitation" and that further "use or occupation ... is prohibited and unlawful." This action is referred to as having the building "placarded."

No owner of the row house at 816 Scott Street responded to an administrative summons, or was located, and the Director of Housing Development caused the building to be placarded as stated above.

The next subsection, (G), of the Housing Code provides a procedure where, if the Director "finds that the conditions causing the structure to be unfit for human habitation, ... are an imminent and immediate threat to the safety of persons occupying the structure," "he shall cause to be posted on the main entrance a placard with words identical to those of division (F) hereof and shall apply to a court of appropriate jurisdiction for an order of ejectment to remove the occupants...."

Sometime later in October of 1983 after the inspection had taken place that caused the 816 address to be placarded, responding to a complaint from an unnamed tenant, 814 Scott Street was also inspected and 116 Code violations were discovered. The fire safety violations included no working smoke detector, no second means of egress, and a missing fire door between the adjoin-

ing buildings. In this instance an owner was located, notified, responded and was given an opportunity to make repairs. A series of hearings and reinspections of 814 Scott Street followed, with the property owner commencing to correct some violations. The last inspection at that address occurred on January 13, 1984, with the serious violations described above still existing. The City made no further inspections before the fire.

The trial was a bifurcated procedure in which the judge decided the liability issues and the jury fixed the amount of damages. The trial court found and apportioned liability 25% against the City, 25% against the property owner, and 50% against the person who firebombed the building. The judge found that, had the fire safety violations stated above been corrected, the spread of the fire would have been slowed, "the additional time ... would have allowed the plaintiffs to be rescued without sustaining the injuries they sustained." The basis for apportioning 25% of the liability against the respondent was:

> "[T]he City failed to coordinate its efforts regarding the inspection of the premises and the adjoining premises at 816 Scott, ... there was no communication between the two inspectors on each side, and the housing department director failed to coordinate the efforts or failed to take appropriate steps to shut down both of these premises until fire safety violations were corrected."

The issue here is whether the City of Covington can be held legally responsible because the City Director of Housing Development did not take further action to close and placard the building at 814 Scott Street when the building owner did not sufficiently repair it. No particular city inspector is charged with misconduct; rather, the charge is there was a breakdown in the department in carrying out the regulatory functions specified in the City Housing Code.

Damages fixed by the jury, for which the City is 25% liable under the court's judgment, were: Denise Gary, $2,096; Jackie Bolden, $153,000; and the Estate of Alexis Bolden, $20,000. The City of Covington was the only defendant to appeal.

On appeal the City argued the failure to properly perform the regulatory activities assigned by the Housing Code should be classified as quasi-judicial in nature, and that, as such, these are not activities for which a municipal corporation is liable in tort. The Court of Appeals agreed and reversed the trial court's judgment to the extent it finds the City of Covington liable. On discretionary review movants argue that this case falls within the type of activities for which a municipal corporation is legally accountable, or, alternatively, that no activity of a municipality improperly performed should be exempt from legal liability. After review we conclude the Court of Appeals is correct; there is no liability in present circumstances.

■ The landmark case on the present status of municipal liability in Kentucky is *Haney v. City of Lexington*, Ky., 386 S.W.2d 738 (1965). *Haney* was a wrongful death action premised on negligent operation of a swimming pool by the City of Lexington. Pre–*Haney* decisions had attempted to differentiate between governmental and proprietary functions, holding a municipal corporation liable to the person harmed if the function was classified as proprietary and immune from liability if classified as a governmental function. This was a long-standing, court created *common law* rule, not to be confused with the doctrine of state sovereign immunity which is constitutionalized in § 231, Kentucky Constitution. Municipal corporations enjoy no constitutional protection from tort liability. In *Haney* we recognize the arbitrary nature of attempted distinctions between governmental and proprietary functions, and then, because "the doctrine runs counter to a basic concept underlying the law of torts, that is, that liability follows negligence [386 S.W.2d at 739]," we "reject[ ] the doctrine of governmental immunity from tort liability as 'an unjust rule which was judicially created.'" 386 S.W.2d at 741. There were subsequent decisions paying lip service to *Haney* in which municipal liability was somewhat

eroded. But in 1985, in *Gas Service Co., Inc. v. City of London*, Ky., 687 S.W.2d 144 (1985), this principle was reaffirmed with the full vigor stated and intended in the *Haney* case, and we do not withdraw from it now.

Nevertheless, a careful reading of *Haney* makes it clear there are certain governmental activities which by their nature do not classify as tortious conduct even though a court might judge they were performed incompetently. These are the activities of government which are essentially judicial and legislative in nature. *Haney* abolishes "immunity from ordinary torts" (386 S.W.2d at 742), but recognizes this does not create liability for the decision-making functions performed by courts and legislative bodies, and this includes those decision-making activities of administrative agencies which are judicial or legislative in nature, thus qualifying as "quasi-legislative or quasi-judicial."

In §§ 895B and 895C, the *Restatement, Second, Torts* sets out the essential nature of sovereign *immunity* for a "State and its governmental agencies," and of municipal *liability* for "local government entities." Where sovereign immunity has been waived, or municipal immunity repudiated, this "does not establish liability for an act or omission that is otherwise privileged or is not tortious." Sections 895B(4) and 895C(3).

> "The mere fact that a person has been harmed by governmental action does not automatically mean that his damage was tortious. In the oft-quoted phrase of Justice Jackson dissenting, in *Dalehite v. United States*, (1953) 346 U.S. 15, 57: 'Of course, it is not a tort for government to govern.'" § 895B, Comment e, *Conduct not tortious*.

Kentucky's decisions have repudiated municipal immunity, but this does not create liability for governmental activity that does not qualify as tortious.

In *Haney v. City of Lexington, supra,* we explain:

> "We now recede from prior decisions which hold municipal corporations immune from liability for ordinary torts.

We wish to make it plain, however, that this opinion does not impose liability on the municipality in the exercise of legislative or judicial or quasi-legislative or quasi-judicial functions....

> ....'Our decision does not broaden the government's obligation so as to make it responsible for all harms to others; it is only as to those harms which are torts that governmental bodies are to be liable by reason of this decision.'" 386 S.W.2d at 742.

In *Gas Service Co., Inc. v. City of London, supra,* we reiterate:

> "*Haney* ... retained immunity only for acts which could be classified as 'the exercise of legislative or judicial or quasi-legislative or quasi-judicial functions.'" 687 S.W.2d at 148.

We then illustrate:

> "[T]wo cases decided since *Haney* that do classify as immune under a reasonable interpretation of the qualifying language of *Haney*.... *Com., Dept. of Banking & Securities v. Brown*, Ky., 605 S.W.2d 497 (1980), the alleged malfeasance of government employees charged with inspection and regulation of American Building and Loan Association an of Prudential Building & Loan Association when they defaulted on their obligations to depositors, and *Grogan v. Commonwealth*, Ky., 577 S.W.2d 4 (1979), the Beverly Hills Supper Club fire disaster in the City of Southgate, where city and state employees were charged with negligent failure to enforce laws and regulations establishing safety standards for construction and use of buildings.
>
> ....
>
> In these cases the government was not charged with having caused the injury, but only with having failed to prevent it by proper exercise of regulatory functions which have elements appearing quasi-judicial and quasi-legislative in nature." *Id.* at 149.

These cases are cited in *Gas Service* to illustrate the activities of administrative agencies which do not classify as torts

without regard to whether the agency involved is an agency of a municipality or of state government. The principle of no liability in this *narrow* and *limited* area does not rest upon tort immunity but upon the fact that the incompetent performance of judicial and legislative acts is not classified as actionable negligence in the tort system. Tort liability does not extend to "cases where the 'government takes upon itself a regulatory function,' *Brown, supra* at 498, which is different from any performed by private persons or in private industry, and where, if it were held liable for failing to perform that function, it would be a new kind of tort liability." *Gas Service, supra,* 687 S.W.2d at 149.

Movants argue it is necessary to further define the area of activity covered by the terms "quasi-judicial" and "quasi-legislative." We can find no better definitions than those in Black's Law Dictionary, Sixth Edition (1990), p. 1245:

> "**Quasi–Judicial**—A term applied to the action, discretion, etc. of public administrative officers or bodies, who are required to investigate facts, or ascertain the existence of facts, hold hearings, weigh evidence, and draw conclusions from them, as a basis for their official action, and exercise discretion of a judicial nature."

> "**Quasi–Judicial Power**—The power of an administrative agency to adjudicate the rights of persons before it."

> "**Quasi–Legislative Power**—The power of an administrative agency to engage in rule-making."

The question before us is how do these definitions apply within the framework of the present case?

Under the procedures put in place by the Covington city ordinances, reports of safety and fire violations, such as that from the unidentified tenant in this case, are sent to the City Director of Housing Development, who then sends inspectors to investigate. When confirmed, no action can be taken except according to the "Complaint Procedure" prescribed in § 152.07 of the Housing Code. The Code provides for the Director to then make administrative decisions, including whether the "structure is unfit for human habitation." In this case, under subparagraph (F) if "the owner fails to comply with an order to repair ... the Director ... *may* cause the structure to be closed ... and placarded," and under subparagraph (G), at any point where he makes a further finding that "conditions ... are an imminent and immediate threat to the safety of persons occupying the structure," "he shall cause" the building to be closed and placarded.

These steps classify as regulatory and quasi-judicial in nature. Legal liability flowing from the existence of these fire and safety violations rests on the owner or other person in possession and control of the building. The duties assigned by the ordinances to the Director and city inspectors are to find or confirm violations, and to decide what needs to be done, whether repairs or placarding the building. The judicial nature of these decisions is underscored by the fact that there are avenues of appeal from the decision of the Director to a reviewing authority and to the courts. There is no more legal liability in this situation for the City than there would be where a judge fails to make a decision or makes a wrong one. The trial court's decision that the City must respond in tort in this situation was in error, not because the City enjoys immunity from tort liability, but because the incompetent performance of decision-making activity of this nature by a governmental agency is not the subject of tort liability.

As did the Court of Appeals, we decline to address two further arguments presented by the City of Covington on appeal because the case is disposed of by the decision on the municipal liability issue.

The Court of Appeals is affirmed, and the trial court is directed to vacate the portion of the judgment against the City of Covington, and enter a new judgment in conformity with this Opinion.

All concur.