RENDERED: MAY 12, 2023; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0009-MR

JAIME MORALES                                      APPELLANT

v.             APPEAL FROM SCOTT CIRCUIT COURT
HONORABLE BRIAN K. PRIVETT, JUDGE
ACTION NO. 19-CI-00593

CITY OF GEORGETOWN,
KENTUCKY; GEORGETOWN
POLICE DEPARTMENT;
LIEUTENANT JAMES WAGONER,
INDIVIDUALLY AND IN HIS
CAPACITY AS A LIEUTENANT
WITH THE GEORGETOWN POLICE
DEPARTMENT; AND OFFICER
JOSEPH ENRICCO, INDIVIDUALLY
AND IN HIS CAPACITY AS A
DEPUTY WITH THE GEORGETOWN
POLICE DEPARTMENT                               APPELLEES

OPINION
AFFIRMING IN PART, REVERSING
IN PART, AND REMANDING

** ** ** ** **

BEFORE: THOMPSON, CHIEF JUDGE; ACREE AND McNEILL, JUDGES.

ACREE, JUDGE: Appellant, Jamie Morales, appeals the Scott Circuit Court's December 28, 2021 Opinion and Order granting the Appellees' motions for summary judgment. The circuit court determined various forms of immunity prevented Appellant's pursuit of any of his claims against any of the Appellees. Having reviewed the record, we affirm in part, reverse in part, and remand.

## BACKGROUND

Appellant is a former special deputy of the Scott County Sheriff's Office (SCSO). On September 11, 2018, he and other law enforcement officers participated in an operation to apprehend Edward Reynolds. During the mission, Appellant was paralyzed, struck by a bullet fired by someone other than Reynolds.

Reynolds was suspected of robbing banks in Florida and North Carolina and was being surveilled by United States Marshals. Marshal Roger Daniel called 911 to request local law enforcement assistance in apprehending Reynolds. He told the dispatcher Reynolds' vehicle was parked at a Scott County interstate rest area, and that Reynolds was asleep inside. The dispatcher routed the call to Lieutenant Gary Crump of the Georgetown Police Department (GPD).

Although employed by the GPD, Crump decided to refer the matter to leadership of the GPD's Special Response Team (SRT), a specialized law enforcement unit which includes members from both the GPD and SCSO.

According to the General Order governing its operations,[1] the SRT is responsible for "respond[ing] to critical or unusual incidents if needed[,]" including high-risk arrests and execution of search warrants, hostage situations, and active shooters. The General Order states that SRT leadership is comprised of a Commander[2] and two Team Leaders, selected by the GPD Chief of Police; SRT leadership is "responsible for unit training" and "coordination of assigned team members[.]" The Commander, or Commanders, and Team Leaders are "in charge of the tactical planning and execution of the plan at any and all call-outs."[3] Only at the direction of the Chief of Police or his designee may SRT leadership deviate from the General Order.

The General Order outlines SRT member selection and training requirements. SCSO and GPD employees may apply to join the SRT and, should there be an opening on the team, must undergo physical agility and firearms

---

[1] The General Order to which the parties refer throughout the arguments is a written document denominated "City of Georgetown, Division of Police, General Order No. 47." It shows the last revision date as April 23, 2015. However, none of the parties explains the origin of the General Order. For purposes of our analysis, we have inferred that it is either a product of the Georgetown City Council's legislative function as an ordinance or was promulgated by the Georgetown Police Department pursuant to an authorized delegation to that department of the city council's rulemaking authority.

[2] As will be discussed *infra*, the SRT has two Commanders.

[3] A "call-out" means an incident for which the SRT is designed to respond, and to which it does respond.

proficiency testing, as well as sit for an interview and administrative review. New members must complete a basic Special Weapons Attack Team (SWAT) class.

Under "Team member commitment and standards" the General Order provides ongoing training requirements for SRT members. These include physical fitness tests, bi-annual handgun and rifle qualification, and monthly training. Members must participate in all training, unless their absence is excused: "[t]eam members must have 100% participation in all monthly training unless absence is approved by the Team Commander, *or* Team Leaders." (Emphasis original.) If a team member has three unexcused absences within a six-month period, he or she is to be removed from the team.

The General Order also contains a section entitled "Equipment." It states that SRT members are to be issued tactical clothing and personal use equipment. While on duty, the member is required to keep the equipment with him and to "always carry them." The team member is required to keep his equipment at home and accessible when off duty.

At the time of the incident that resulted in Appellant's injuries, the SRT included four SCSO employees: Sergeant Devon Brinegar, Deputy Michael Jacobs, Lieutenant Joseph Hudnall, and Appellant. The team also included four GPD employees: Sergeant Josh Nash, Appellee Lieutenant James Wagoner, Lieutenant Gary Crump, Appellee Officer Joseph Enricco, and Sergeant Nicholas

Lodal. Lieutenant Hudnall and Lieutenant Wagoner were the SRT's joint-commanders. Lieutenant Crump is also a trained hostage negotiator, and Sergeant Lodal is an emergency medical technician (EMT). Wagoner was the SRT commander on duty when Crump referred Marshal Daniel's request for local law enforcement backup; Hudnall was off duty at the time.

Lodal and Crump completed a risk matrix, which produced a score of "14" – a score indicating the risk involved in law enforcement's response was not so high that an official SRT "call-out" was required. However, and as the circuit court noted, whether the operation was a formal SRT call-out remains a disputed issue.

Once the officers were assembled, Wagoner, Enricco, Crump, and Lodal boarded the ballistically-rated armored SRT vehicle and drove to a rally point: a Cracker Barrel restaurant near Reynolds' vehicle. Other SRT members – Appellant, Brinegar, and Jacobs – also met at the rally point. In addition to then-current SRT members, GPD Officer Chris Wallace and a former SRT member, SCSO Sergeant Jeremy Nettles, participated. Appellant had replaced Nettles following the latter's departure from the SRT.

Following a briefing, Appellant, Wagoner, Lodal, Crump, Enricco, Jacobs, and Brinegar loaded into the SRT vehicle. Appellant observed the GPD members of the SRT were wearing protective tactical vests; these vests contain

metal plates designed to protect the wearer from gunfire. Appellant asked Brinegar whether he should wear his, and Brinegar told him that he did not believe the vests would be necessary. At some point, Appellant asked Nettles the same question, and Nettles also stated his belief that the vests were unnecessary. Both Nettles and Brinegar were Appellant's superiors at SCSO.

Wagoner drove the SRT vehicle to the rest area and parked behind Reynolds' vehicle, blocking him from escaping. All SRT members exited the vehicle. Jacobs immediately approached the driver's side of Reynolds' vehicle, followed by Appellant, Enricco, and Brinegar; the four of them stood close to one another against Reynolds' vehicle. Nettles also approached and positioned himself on the vehicle's passenger side, opposite the other officers.

They began shouting at Reynolds to exit the vehicle. This awakened the sleeping Reynolds who started his car and shifted into reverse. He quickly realized he was blocked in. Appellant and Nettles attempted to break out the vehicle's windows, and Appellant succeeded in doing so. Reynolds then retrieved a handgun from the center console. One of the officers saw this and shouted "gun." The SRT opened fire on Reynolds, killing him.

During the melee, Appellant was shot – not by Reynolds, but from behind. As a result, Appellant is now a paraplegic.[4] From the time the officers exited the SRT vehicle until the gunfire ceased, approximately thirty-four seconds elapsed.

Though Appellant claims Wagoner failed to create an operational plan to apprehend Reynolds, the record makes clear that Wagoner created a three-part plan: (1) the officers and deputies would line up behind the SRT vehicle and an attempt would be made to call out Reynolds; (2) Crump would engage in negotiations with Reynolds should Reynolds refuse to surrender voluntarily; and (3) if Reynolds still refused to surrender, Wagoner would be on-scene to decide what action to take next. Traffic on the nearby interstate would be blocked, and officers would be positioned to intercept Reynolds should he take flight in his car. GPD Assistant Chief Robert Swanigan and GPD Chief Mike Bosse both reviewed the plan in advance and believed it was appropriate.

In an effort to demonstrate that no plan existed, Appellant argues the circuit court's statement that the officers acted "without the benefit of coordinated plan or any type of contingency plan" has the effect of acknowledging a fact – that Wagoner failed to create an operational plan. However, when read in context, the

---

[4] As the circuit court notes, the bullet is still lodged in Appellant's spine. Therefore, it is impossible to test the bullet ballistically to determine who shot him.

circuit court is describing the scene unfolding as Jacobs failed to wait and, instead, immediately approached Reynolds' vehicle; the plan was compromised, and it was at that point the officers no longer benefitted from any plan.

Indeed, the depositions reflect that the operation was never intended to be a "vehicle assault," meaning it was not a part of the plan for Jacobs to proceed directly to Reynolds' vehicle with others, including Appellant, following immediately behind for his protection. Despite being present at the rally point, Jacobs testified he did not remember hearing Wagoner communicate a plan to the team. Rather, he followed his general training for vehicle assaults and approached Reynolds' car without waiting. While Hudnall testified that a plan for a vehicle assault would be required if vehicle assault was indeed the mission, he never testified that Reynolds' apprehension was intended as a vehicle assault.

The depositions also demonstrate communication of the plan from Wagoner to the officers – from both GPD and SCSO – during a briefing at the rally point lasting approximately five minutes. Crump, Brinegar, and Nettles testified that Wagoner clearly communicated his plan. Lodal did not hear the entire plan during the rally point briefing; being a paramedic, he stepped away during the briefing to gather medical supplies. However, he testified he previously heard the plan and, therefore, he did not need to stay in the rally point huddle. Enricco testified that he knew exactly what Wagoner wanted him to do after the briefing.

Though Jacobs believed the plan was to proceed directly to Reynolds' vehicle, he testified that he did not remember what the conversation at the rally point was about and did not criticize Wagoner's leadership of the operation.

The Kentucky State Police (KSP) performed an independent investigation of the shooting. Claude Little, the lead investigator, determined Appellant discharged his weapon six times, Enricco discharged his weapon five times, and Jacobs discharged his weapon four times. Because the officers had moved around, Little could not determine the exact location of any of the officers when they fired, nor could he determine who shot Appellant. The investigation also confirmed Reynolds did not discharge his weapon.

Appellant filed suit on September 16, 2019, asserting negligence against Wagoner individually, Enricco individually, the City of Georgetown, and GPD. Appellees filed summary judgment motions on October 15, 2020. The circuit court granted the motions for all Appellees based on the individual Appellees' qualified official immunity. This appeal followed.

**STANDARD OF REVIEW**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law." CR[5] 56.03. "An

appellate court's role in reviewing a summary judgment is to determine whether

the trial court erred in finding no genuine issue of material fact exist[ed] and the

moving party was entitled to judgment as a matter of law." *Feltner v. PJ*

*Operations, LLC*, 568 S.W.3d 1, 3 (Ky. App. 2018); *see also Smith v. Crimson*

*Ridge Dev. LLC*, 410 S.W.3d 619, 620 (Ky. App. 2013) (citing CR 56.03;

*Steelvest, Inc. v. Scansteel Serv. Ctr.*, 807 S.W.2d 476, 480 (Ky. 1991)). "The

record must be viewed in a light most favorable to the party opposing the motion

for summary judgment and all doubts are to be resolved in his favor." *Steelvest*,

807 S.W.2d at 480. Appellate courts review a circuit court's summary judgment

*de novo*. *Cmty. Fin. Servs. Bank v. Stamper*, 586 S.W.3d 737, 741 (Ky. 2019).

## ANALYSIS

Application of qualified official immunity "turns on whether the acts

of the various defendants were discretionary or ministerial." *Marson v. Thomason*,

438 S.W.3d 292, 296 (Ky. 2014) (citing *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky.

2001)). Public officers and employees are entitled to qualified official immunity

for performance of discretionary acts, which are those acts "involving the exercise

of discretion and judgment, or personal deliberation, decision, and judgment[,]" so

long as those acts are performed in good faith and are within the scope of the

---

[5] Kentucky Rules of Civil Procedure.

individual's authority. *Yanero*, 65 S.W.3d at 522. Qualified immunity "is more than just a defense; it alleviates the employee's or officer's need to even defend the suit, which is to be dismissed." *Marson*, 438 S.W.3d at 298.

"[D]iscretionary acts or functions are those that necessarily require the exercise of reason in the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued." *Haney v. Monsky*, 311 S.W.3d 235, 240 (Ky. 2010). Such discretion exists "when the act may be performed in one or two or more ways, either of which would be lawful, and where it is left to the will or judgment of the performer to determine in which way it shall be performed." *Id*. (citing *Upchurch v. Clinton County*, 330 S.W.2d 428, 430 (Ky. 1959)).

Public officers and employees, therefore, are "afford[ed] protection from damages liability for good faith judgment calls made in a legally uncertain environment." *Yanero*, 65 S.W.3d at 522. In other words, "'[o]fficials are not liable for bad guesses in gray areas[.]'" *Rowan Cnty. v. Sloas*, 201 S.W.3d 469, 475 (Ky. 2006) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992), *cert. denied*, 506 U.S. 1080, 113 S. Ct. 1048, 122 L. Ed. 2d 356 (1993)). "Thus, 'qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"'" *Id*. (quoting *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S. Ct. 3034, 3038, 97 L. Ed. 2d 523 (1987)).

-11-

However, qualified official immunity does not apply to the failure to perform a ministerial act, meaning an act "that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Yanero*, 65 S.W.3d at 522. It is a "direct and mandatory act[.]" *Marson*, 438 S.W.3d at 297. If an act is ministerial, therefore, a lawsuit will proceed to its merits: "[o]f course, whether a ministerial act was performed properly, i.e., non-negligently, is a separate question from whether the act is ministerial, and is usually reserved for a jury." *Id.*

Categorizing actions as either ministerial or discretionary is difficult, and "has long plagued litigants and the courts." *Id.* at 296. The classification "rests not on the status or title of the officer or employee, but on the function performed." *Yanero*, 65 S.W.3d at 521. "[E]xcept with respect to immunities granted by express constitutional or statutory provisions, immunity issues are resolved by examining 'the nature of the functions with which a particular official or class of officials has been lawfully entrusted[.]'" *Id.* at 518 (quoting *Forrester v. White*, 484 U.S. 219, 224, 108 S. Ct. 538, 98 L. Ed. 2d 555 (1988)). Further, "an act is not necessarily taken out of the class styled 'ministerial' because the officer performing it is vested with a discretion respecting the means of method to be employed." *Collins v. Commonwealth, Nat'l Res. and Env't Prot. Cabinet*, 10

S.W.3d 122, 125 (Ky. 1999). While "few acts are ever purely discretionary or purely ministerial[,]" the question can be determined by identifying "the *dominant* nature of the act." *Haney v. Monsky*, 311 S.W.3d at 240 (emphasis original).

The circuit court granted summary judgment in favor of Appellees based on the entitlement of each to qualified official immunity. On review, we must decide whether the circuit court correctly determined there was no genuine issue regarding any material fact evidencing Appellees' performance of ministerial duties, and no genuine issue regarding the good faith performance of any discretionary duty.

At the outset, we observe that both Appellant and Appellees devote much of their briefing to the adequacy of the operational plan, SRT training, and other deficiencies alleged by Appellant in pursuing his claims of negligence. However, the issues before this Court do not require the evaluation of Appellant's claims of negligence. Immunity determinations precede the substance of negligence claims themselves. The circuit court did not reach the merits of Appellant's claims and neither does this Court.

Because immunity is a doctrinally thorny question, we review application of the doctrine of qualified official immunity as to each Appellee.

*I. Lieutenant Wagoner.*

Appellant argues the circuit court erred by granting summary judgment for Wagoner for five reasons. First, he argues Wagoner's duty to create and communicate an operational plan was ministerial, and that disputed material facts exist as to whether he was negligent in doing so or failing to do so. Second, he argues Wagoner had a ministerial duty to supervise during the attempted apprehension of Reynolds, and that questions of fact exist as to whether he negligently failed to do so. Third, he argues a question of fact remains as to whether Wagoner had a ministerial duty to ensure SRT members wore their protective equipment. Fourth, he argues Wagoner had a ministerial duty to enforce training and training attendance, and that questions of fact exist as to whether he negligently failed to enforce these requirements. Fifth, he argues Wagoner is not entitled to immunity under the Claims Against Local Governments Act (CALGA) as a matter of law.

No charge is made that Wagoner acted in bad faith or in a manner outside of his authority – the second and third prongs of the *Yanero* analysis, 65 S.W.3d at 522 – and thus our review of whether the circuit court's application of qualified immunity to Wagoner is reserved to the question of whether his actions and obligations were discretionary or ministerial.

As to the first, second, and fourth arguments, Appellant invites us to identify questions of fact that are immaterial to our qualified immunity analysis. It matters not, at this stage, whether questions regarding Wagoner's negligence remain unresolved. Though we are tasked, for the purposes of qualified official immunity, with analyzing the nature of the acts or omissions which Appellant alleges to be negligent, we do not opine as to any alleged negligence at the hands of Wagoner.

*a. Creation and Communication of an Operational Plan.*

Appellant asserts Wagoner had a ministerial duty to create a tactical and operational plan to apprehend Reynolds. He notes that the General Order specifically states that SRT leadership is responsible for planning and executing tactical and operational plans for SRT call-outs. Thus, he argues, based on the General Order, Wagoner had no discretion in deciding to formulate a plan and, therefore, creation of a tactical and operational plan is a ministerial act.

In *Haugh v. City of Louisville*, police officers used a combination of lethal and nonlethal force – including pepper spray, tear gas, bean bag rounds, a fire hose, and a police canine – to attempt to subdue Terry Hines. 242 S.W.3d 683, 685 (Ky. App. 2007). After attempting to arrest Hines pursuant to bench warrants, the police officers withdrew and called a negotiation team, a canine team, and a SWAT team to the scene; the commanding officers decided to "rapidly storm" the

residence and use nonlethal force to quickly arrest Hines. *Id*. at 684-85. Hines was brandishing a butcher knife and had stabbed the police canine and was only subdued after an officer managed to "literally sh[o]ot the butcher knife from his hand with a bean-bag round[.]" *Id*. at 685. Following his arrest, Hines died at the hospital from injuries he sustained during the arrest. *Id*.

In affirming the circuit court's conclusion that the officers were entitled to qualified official immunity from suit from Hines' estate, we determined the commanding officers' "decision to storm Hines's residence and to use nonlethal force to quickly subdue him is entitled to qualified immunity, because, at minimum, it was a good faith judgment call made in legally uncertain circumstances." *Id*. at 686. We noted the decision to storm the residence rather than use a different tactic, such as forming a blockade outside, was within the scope of their discretion as police officers. *Id*. at 686-87.

As in *Haugh*, Wagoner was faced with legally uncertain circumstances, requiring him to use his discretion in attempting to apprehend Reynolds. Examples of Wagoner's exercise of discretion include Wagoner's decisions to block in Reynolds' vehicle using the SRT vehicle, to stack up officers alongside the truck, to attempt to call Reynolds out, and to have a trained hostage negotiator on-hand if needed. Wagoner was also on-scene to make decisions should negotiations fail, because Reynolds' reaction would dictate the appropriate

response.  To the extent Wagoner's duty to formulate and convey a plan is ministerial, he met his duty.  Executing a plan and adjusting to the actions of officers whose attention, memory, or compliance may have been lacking, however, involved discretion.

From the moment the plan was conveyed to the officers at the rally point, Wagoner's actions "involv[ed] the exercise of discretion and judgment, or personal deliberation, decision, and judgment[,]" and "necessarily require[d] the exercise of reason in the adaptation of means to an end[.]"  *Haney v. Monsky*, 311 S.W.3d at 240.  We conclude "the *dominant* nature of the act" of implementing the plan was discretionary.  *Id.*

As will be discussed *infra*, there is conflicting testimony of record as to whether the operation to apprehend Reynolds was a formal SRT call-out.  However, for purposes of our review, we presume it was.  Even so, the General Order states "[t]he Special Response Commander and Team Leaders will be in charge of the tactical planning and execution of the plan at any and all call-outs."  If this language was intended to impart a ministerial duty, it could have been more clearly stated.  Nevertheless, however, and we repeat, to the extent this imposes a ministerial duty, that duty can only be to prepare a plan – what that plan entails and the manner of its execution involve predominantly discretionary decisions.

-17-

*b. Supervision of SRT During Attempted Apprehension of Reynolds.*

Appellant argues Wagoner's duty to supervise the attempted apprehension of Reynolds was ministerial, and thus Wagoner is not entitled to qualified immunity. He seeks to distinguish the manner of supervision from the obligation to supervise; he argues that, although the former (manner of supervision) can be discretionary, the latter (duty to supervise) is ministerial.

Though a rule or order creating a general supervisory duty need not be "exhaustively specific" for such duty to be ministerial, "it must, at least, be sufficiently specific to restrict significant discretion in its enforcement." *Haney v. Monsky*, 311 S.W.3d at 243. In *Haney v. Monsky*, a camp counselor and employee of the Louisville Zoo, Haney, led campers in an activity called the "night hike." *Id*. at 238. During the hike, campers lined up and placed their hands on the shoulders of the camper in front of them; Haney would lead the campers down a short, clear, and level trail. *Id*. In the dark, the campers fell, and one camper fractured his shoulder. *Id*. at 238-39. The Supreme Court noted that Haney did receive an instruction to "keep the children in the middle of the path" during her camp counselor training. *Id*. at 242-43. However, it determined the supervision obligation was discretionary, because Haney had "a general and continuing supervisory duty to keep the children on the middle of the path which depended upon constantly changing circumstances[.]" *Id*. at 243.

-18-

We find the circumstances of *Haney v. Monsky* analogous to the instant case. Wagoner was presented with a delicate and high-stakes situation that inherently involved constantly changing circumstances. Any number of situations could arise during an attempted apprehension of the fugitive Reynolds. The task required flexibility as the situation developed in real time; this flexibility was built into Wagoner's plan, which had him on scene to decide what to do should negotiations with Reynolds fail. Therefore, as in *Haney v. Monsky*, we conclude the dominant nature of Wagoner's duty to supervise qualifies it as discretionary.

### c. *Protective Equipment.*

Next, Appellant asserts Wagoner had a ministerial duty to ensure SRT members wore their protective equipment, such as tactical vests and helmets. In his report and his deposition, Sutton stated to his belief that the General Order requires team members to wear their issued protective equipment during SRT call-outs. However, even if this were an official SRT call-out, the plain language of the General Order does not include this requirement. Instead, it requires that team members keep their issued tactical equipment with them while on duty – and available while off duty – and charges team members with maintenance of their issued equipment. The General Order contains no explicit requirement that team members wear their tactical equipment during SRT call-outs.

However, an unwritten but "known rule" can create a ministerial obligation. In *Yanero*, a high school baseball player, Yanero, was struck in the head by a baseball during batting practice while he was not wearing a batting helmet. 65 S.W.3d at 517. The Kentucky Supreme Court determined Yanero's coaches had a ministerial duty to ensure players wore batting helmets during batting practice because "it involved only the enforcement of a known rule[.]" *Id.* at 529. While promulgation of such a rule may be discretionary, its enforcement is ministerial. *Id.*

A similar "known rule" existed in *Gaither v. Justice & Public Safety Cabinet*, 447 S.W.3d 628 (Ky. 2014). KSP officers used Lebron Gaither as a confidential informant for their investigations into certain drug dealers and had him testify before the grand jury; during his testimony, Lebron implicated an individual named Jason Noel. *Id.* at 630-31. One of the jurors knew Noel and tipped Noel off about Lebron's cooperation with KSP. *Id.* at 631. The next day, KSP officers again used Lebron as an informant and had him attempt a drug buy from Noel, which led to Lebron's capture, torture, and murder. *Id.*

The Kentucky Supreme Court determined KSP officers had a ministerial duty not to use Lebron as a confidential informant after he had been identified to criminal suspects. *Id.* at 633. It determined "the act of using [Lebron] in a buy/bust operation within the same community after his identity as a police

-20-

informant had been compromised violated a *known rule* defining prudent behavior in the use of a confidential informant[.]" *Id*. at 636 (emphasis added). The testimony of "distinguished professionals experienced in the investigation and prosecution of drug cases and the use of confidential informants" clearly indicated reuse of a confidential informant in that manner was something the police simply do not do. *Id*. at 635.

Significant to our analysis here, the Supreme Court determined this known rule existed despite it not being recorded in any statute, regulation, or formal policy; "the duty compelling the performance of a ministerial act need not spring from a specific statute, administrative regulation, or formal policy statement or protocol." *Id*. at 635.

There are at least three genuine issues of material fact related to the use of protective equipment and, therefore, the circuit court erred in granting summary judgment on this point.

First, there is a genuine question as to whether this mission was a formal SRT call-out. On one hand, the General Order states that "[t]he commander will decide if the situation warrants a call[-]out." Again, Lodal and Crump completed a risk matrix, which produced a score that indicated an official call-out was not necessary. Indeed, Wagoner testified that the function of the risk matrix was to determine whether an SRT call-out is appropriate. Appellant's expert,

Sutton, also acknowledged that a low score on the risk matrix indicated that the operation would be handled by on-duty patrol units – though he disagreed with the low score – and he was unable to say whether this was an official call-out. As Lodal testified, the operation was a patrol-level function rather than an official SRT call-out. Lodal and Crump testified that Wagoner, nevertheless, decided to use on-hand SRT personnel to respond; Wagoner testified he did so because he believed the SRT members' training could be helpful.

Hudnall, despite not being present during the mission, provided testimony which suggests the operation was not a formal call-out. As he explained, he first heard about the operation when he received a phone call from Nettles, who informed Hudnall that Appellant had been shot and that he was being taken to the hospital. Hudnall also testified that, because he was one of two SRT commanders, the fact he was not called to participate and that no one attempted to reach him before the mission suggests it was not an official SRT call-out.

On the other hand, other evidence suggests the operation was indeed a formal SRT call-out. Little testified to his conclusion the mission was, in fact, an SRT call-out, based on his interviews with participants, the use of the SRT vehicle, and the fact that SRT members responded in the vehicle. Police dispatch referred to the operation as an "SRT call" and reported they were "waiting for SRT to get in place." Appellant believed the mission was a formal SRT call-out. And, tellingly,

Hudnall testified that he believed the operation was a call-out. Although he was not present, Hudnall testified he heard the operation was an SRT call-out. Hudnall also testified that every time the SRT vehicle had been used the operation was an SRT call-out, and that he had never been on a joint mission between GPD and SCSO where it was not an SRT call-out.

Second, if this mission was an SRT call-out, there is a genuine question as to whether it was an unwritten but known rule to wear protective equipment during all SRT call-outs. Hudnall testified that if a mission was an SRT call-out "they're going to be plated up in full tactical gear" but, if not, then the decision to wear tactical equipment is up to the individual officer. Enricco testified that he wears all issued equipment during SRT call-outs and that he had been instructed to do so. However, from Nettles' actions, he did not believe wearing a tactical vest was required. He testified he had his protective vest with him and chose not to wear it; he observed that SCSO deputies did not wear theirs, while GPD officers did. Appellant himself, when asked whether it was customary for him to wear his tactical vest during SRT call-outs, replied: "Not always."

Third, a genuine question exists as to whether there was a known rule requiring the wearing of protective equipment during these operations, regardless of whether the mission was an SRT call-out. Brinegar testified that wearing a vest is a matter of discretion for each individual deputy or officer. Neither Brinegar nor

Nettles wore tactical vests and because they told Appellant they did not believe vests were necessary when Appellant asked, apparently they were of the understanding that vests were optional. But, Wagoner, who testified as to his belief that the operation was not a formal SRT call-out, also testified as to his belief that "the SRT members . . . knew that they were expected to wear their given equipment." Further, Sutton testified that protective equipment should be worn during all tactical operations, and that such requirement should be included in formal policy.

Again, when determining whether to grant summary judgment, a circuit court is required to examine the record "in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Steelvest*, 807 S.W.2d at 480. When looking at this issue through that lens, these three genuine issues of material fact reveal the circuit court erred in granting summary judgment regarding the wearing of tactical vests. Mindful, again, our review is limited to whether qualified immunity attaches, we express no opinion on the merits of Appellant's allegations of negligence.

d. *Training and Training Attendance Requirements.*

Appellant argues Wagoner had a ministerial duty to enforce training requirements and training attendance requirements and, therefore, that Wagoner was not entitled to qualified immunity regarding the claim he breached that duty.

The circuit court relied upon *Nichols v. Bourbon County Sheriff's Department* for the proposition that "[s]upervision and training are discretionary functions." 26 F. Supp. 3d 634, 642 (E.D. Ky. 2014) (citing *Rowan Cnty.*, 201 S.W.3d at 480).

However, this statement of Kentucky law by the federal court is overly general. Indeed, the Kentucky Supreme Court in *Rowan County v. Sloas* acknowledged the possibility that training could be a ministerial function: "*Ministerial training is where you are mandated to train to avoid the event that occurred.*" 201 S.W.3d at 481 (emphasis original).

Because obligations related to training are not always discretionary, we must determine whether the nature of Wagoner's alleged duties regarding training and enforcing training attendance entitle him to qualified immunity. Per the General Order, "[t]he commander and team leaders will be responsible for unit training[.]" Further, "[t]eam members must have 100% participation in all monthly training" unless absence is approved. Each team member is "required to attend all team training exercises as scheduled." Three unexcused absences from training within six months results in dismissal from the SRT. As Hudnall testified in his deposition, training attendance and absences from training is something for which the SRT should have kept records.

In light of the General Order's attendance requirements, the General Order creates an obligation for SRT leadership to ensure that training attendance

-25-

requirements are enforced, in addition to selecting training material and conducting trainings. As the United States Court of Appeals for the Sixth Circuit succinctly summarized, and with which we agree, "although deciding on the content of policies and training is a discretionary function, the training of employees to adhere to their duties once that content is decided is a ministerial function." *Hedgepath v. Pelphrey*, 520 F. App'x 385, 391 (6th Cir. 2013) (citing *Yanero*, 65 S.W.3d at 529).

The distinction between selecting training content and setting training requirements, and enforcing these requirements, is a distinction that applies in the instant case. As for Wagoner's alleged obligation to select training topics for the SRT, this obligation is discretionary in its nature. Because the SRT could encounter a broad variety of circumstances in the field, training the SRT requires exercise of judgment to determine what manner of training will most appropriately prepare the team. Selecting training content inherently "involve[s] the exercise of discretion and judgment, or personal deliberation, decision, and judgment[.]" *Yanero*, 65 S.W.3d at 522. In this regard, the circuit court did not err in affording Wagoner qualified official immunity.

However, the General Order creates attendance requirements which do not require discretion in their enforcement. Every team member is required to attend all trainings, unless excused. If a team member fails to attend the requisite

number of sessions without obtaining leave not to attend, the member is to be removed from the team. Enforcement of training attendance and dismissing team members who do not meet their training requirements, as well as leading training sessions, require a minimal degree of discretion. Whether an act is ministerial or discretionary depends upon "the *dominant* nature of the act[,]" *Haney v. Monsky*, 311 S.W.3d at 240, which here reveals a duty that is "absolute, certain, and imperative, involving merely execution of a specific act[.]" *Yanero*, 65 S.W.3d at 522. Therefore, the circuit court erred in granting Wagoner qualified immunity as to enforcement of training attendance.

*e. CALGA Immunity.*

Appellant argues Wagoner is not entitled to immunity under CALGA, KRS[6] 65.200 *et seq*. As Appellant correctly notes, the circuit court in this case did not opine as to whether CALGA immunity applied to Wagoner in its order. Despite this, Appellant continues to argue on appeal against the statute's applicability to Wagoner because the statute only provides immunity to local governments. As relevant, the statute provides:

> a local government shall not be liable for injuries or losses resulting from . . . [a]ny claim resulting from the exercise of judicial, quasi-judicial, legislative or quasi-legislative authority or others, exercise of judgment or discretion vested in the local government, which shall include by example . . . [t]he exercise of discretion when in the face

---

[6] Kentucky Revised Statutes.

> of competing demands, the local government determines whether and how to utilize or apply existing resources[.]

KRS 65.2003(3)(d). CALGA defines "local government" to mean "any city incorporated under the law of this Commonwealth, the offices and agencies thereof, any county government or fiscal court, any special district or special taxing district created or controlled by a local government." KRS 65.200(3).

Our jurisprudence has interpreted the scope of CALGA immunity broadly, and we previously determined CALGA immunity applies to local government officials. *See Godman v. City of Fort Wright*, 234 S.W.3d 362 (Ky. App. 2007) (affirming application of CALGA immunity to a city and its officials for revocation of a temporary access point to the appellants' real property). As we have previously explained, "KRS 65.2003 does protect the City and its officials from claims arising from 'the exercise of judicial, quasi-judicial, legislative or quasi-legislative authority.'" *Id*. at 370.

However, CALGA immunity only immunizes local governments and their officials for discretionary actions: "[n]othing contained in this subsection shall be construed to exempt a local government from liability for negligence arising out of acts or omissions of its employees in carrying out their ministerial duties." KRS 65.2003. Accordingly, Wagoner is only entitled to CALGA immunity for those acts determined to be discretionary as per our previous analysis.

## II. Officer Enricco.

Appellant argues the circuit court erred in applying qualified immunity to Enricco. The circuit court determined Enricco's decision to use deadly force, under the facts of the case, was discretionary and thus entitled him to immunity. We agree.

Kentucky case law is limited on the precise point of whether a police officer's use of deadly force is discretionary, and thus the circuit court availed itself of federal cases applying Kentucky law. Chiefly, the circuit court analyzed *Reich v. City of Elizabethtown*, where the police shot and killed a man who charged them with a knife. 945 F.3d 968, 974-75 (6th Cir. 2019). The Sixth Circuit determined the officers were entitled to qualified immunity for state law claims under the *Yanero* analysis because their decision to use deadly force was discretionary: "[t]he determination of the amount of force required, including the decision to use deadly force, is a discretionary act." *Id*. at 982-83 (citing *Yanero*, 65 S.W.3d at 521-22). In reaching the conclusion that the officers "performed discretionary acts[,]" the Sixth Circuit noted that KRS 503.050(1)-(2) authorizes individuals to use deadly force to protect themselves or others if the individual believes such force is necessary to protect against death or serious physical injury. *Id*. at 983. Because there was no showing that the officers acted in bad faith and because "use of deadly force plainly falls within the scope of a police officer's

authority[,]" the Sixth Circuit determined that each prong of the *Yanero* analysis had been met. *Id.*

As the circuit court determined, Enricco acted within the scope of his authority and Appellant did not assert that Enricco acted in bad faith. Appellant does not challenge these conclusions on appeal but, rather, challenges the circuit court's determination that Enricco's actions were discretionary. However, Appellant argues the circuit court conflated Enricco's decision to use deadly force with his obligation to do so in a manner that did not endanger his fellow officers; the former, Appellant argues, is discretionary, while the latter is ministerial.

Appellant offers *Speck v. Bowling* as authority. In that case we identified a distinction between a police officer's discretionary choice to drive his cruiser and his ministerial obligation to not be negligent when doing so. 892 S.W.2d 309, 310-11 (Ky. App. 1995). In *Speck*, a state trooper, Speck, crossed the center line while driving and struck Bowling's vehicle. *Id.* at 310. Speck was responding to a burglary at the time. *Id.* at 311. We determined that an officer's operation of his vehicle is a ministerial activity rather than discretionary:

> [W]hen the government or its agent engaged in an activity normally undertaken by private individuals in the course of their everyday lives, a duty arises under the common law to exercise reasonable care in the performance of this task. Governmental employees, like ordinary citizens, must operate their vehicles in a reasonable safe manner and avoid creating foreseeably unreasonable risks of harm to the motoring public.

*Id.* (quoting *Letowt v. City of Norwalk*, 579 A.2d 601, 603 (Conn. Super. 1989)).

Appellant also cites *Jones v. Lathram*, another case in which a law enforcement officer struck a motorist while driving. 150 S.W.3d 50, 51 (Ky. 2004), *as amended* (Jan. 31, 2005). The Supreme Court determined the act of driving to a location in response to a call for assistance was ministerial: "the act of safely driving a police cruiser, even in an emergency, is not an act that typically requires any deliberation or the exercise of judgment." *Id.* at 53. Though driving in response to an emergency required the trooper to react to roadway danger and to "constantly reassess his position on the road[,]" the Supreme Court determined "no decisions that would appear to be truly discretionary acts" were made in the course of driving. *Id.*

Of course, an obvious difference exists between an officer driving his cruiser and Enricco's discharge of his weapon in the present case. Using deadly force during the apprehension of a criminal suspect is not, as we stated in *Speck*, "an activity normally undertaken by private individuals in the course of their everyday lives[.]" *Speck*, 892 S.W.2d at 311. In fact, such activity is entrusted specifically to law enforcement, and its exercise is foreclosed to private individuals. Thus, we do not find *Speck* controlling here.

Furthermore, an officer's decision to exercise deadly force, after that decision is made, requires the exercise of judgment. Unlike the act of driving as

-31-

explored in *Jones*, discharge of a firearm by a police officer includes a multitude of judgment calls, including where to fire and when to cease firing, among others. The decision to exercise deadly force is categorically different than an officer driving his cruiser in response to a call, and thus we decline Appellant's invitation to analogize driving a vehicle with a goal to do no harm on the one hand, and discharging a weapon at a suspect when the purpose is to eliminate the threat the suspect poses on the other.

Based on the circumstances of the attempted apprehension of Reynolds – that Reynolds brandished a gun, that an officer alerted the team to that fact, and that Reynolds was suspected of robbing banks – Enricco, in his discretion, used deadly force in response. The judgment calls Enricco made in the use of deadly force – whether to do so, where he pointed his weapon, when to cease firing – have permanent effects on everyone involved. However, the consequences of such judgment calls do not, and legally cannot, affect the determination that such decisions are discretionary.

### III. City of Georgetown and GPD.

Appellant claims the City and GPD are liable to Appellant directly, but also vicariously, based on allegations that either Wagoner or Enricco or both are liable. We address the claims of vicarious liability first.

The circuit court concluded that because both Wagoner and Enricco were qualifiedly immune, they could not be liable, thereby eliminating the basis of Appellant's vicarious liability claims against the City and GPD. We have affirmed the circuit court's determination that Enricco is entitled to qualified immunity. Therefore, there can be no primary liability, vis-à-vis Enricco, to which the City's and GPD's liability can attach vicariously. "Indeed, vicarious liability is not possible without primary liability." *Haugh*, 242 S.W.3d at 687 (citing *City of Louisville v. Bergel*, 610 S.W.2d 292, 293 (Ky. 1980)).

However, we reversed the circuit court's holding that Wagoner was entitled to qualified immunity as to two of Appellant's claims: (1) Wagoner's duty to enforce a rule (to the extent such a rule can be proven) that requires the officers to don protective gear; and (2) the duty to enforce training rules.

Wagoner may still enjoy qualified official immunity regarding his duty to enforce a rule for donning protective gear. That will depend on how the outstanding genuine issues of material fact are resolved. If resolution of the unresolved genuine issues of material fact demonstrate he had discretion in ordering the donning of protective gear, or if discretion is to be exercised independently by each officer, qualified immunity will attach; the City and GPD then could not be vicariously liable. If resolution of those issues shows Wagoner's duty was ministerial, proof that Wagoner breached that duty could result in his

primary liability to Appellant; for that reason, the City's and GPD's vicarious liability remains a possibility. Dismissal of claims that the City and GPD are vicariously liable for any breach of a ministerial duty Wagoner may have committed regarding the donning of protective gear therefore must be reversed.

As to Wagoner's duty to train and enforce training attendance rules, we held he was not entitled to qualified immunity. Wagoner's potential direct liability still exists as to this claim and, therefore, the City's and GPD's vicarious liability remains a viable claim. Dismissal as to those claims of vicarious liability must be reversed.

Furthermore, and for clarity's sake, CALGA affords the City and GPD no immunity from claims of vicarious liability as the Act expressly states: "Nothing contained in this subsection shall be construed to exempt a local government from liability for negligence arising out of acts or omissions of its employees in carrying out their ministerial duties." KRS 65.2003. To the extent the City's and GPD's vicarious liability remains a possibility as just described, we reverse the circuit court's order dismissing those parties.

However, we affirm the dismissal of the claims of direct liability against the City and GPD, but not for the reasons cited by the circuit court. "Even if a lower court reaches its judgment for the wrong reason, we may affirm a correct

result upon any ground supported by the record." *Wells v. Commonwealth*, 512 S.W.3d 720, 721-22 (Ky. 2017).

Appellant's claims against the City and GPD for direct liability allege "the City/GPD's failure to enforce its own training requirements." (Appellant's brief, p. 39.) We conclude that the circuit court was correct when it dismissed these claims, "not because the City enjoys immunity from tort liability, but because the incompetent performance of decision-making activity of this nature by a governmental agency is not the subject of tort liability." *Bolden v. City of Covington*, 803 S.W.2d 577, 581 (Ky. 1991).

As noted earlier,[7] we infer, for we are not otherwise informed, that issuance of the General Order mandating SRT training requirements is either directly or indirectly attributable to the legislative authority of the City to enact ordinances and rules. We need not retrace every step of the winding road of municipal government immunity jurisprudence whose milestones include *Haney*[8]

---

[7] *See*, footnote 1, *supra*.

[8] *Haney v. City of Lexington*, 386 S.W.2d 738 (Ky. 1964). *Haney* "abrogated the former rule of sovereign immunity for a municipal corporation." *City of Lexington v. Yank*, 431 S.W.2d 892, 893 (Ky. 1968).

and *Gas Service Company*[9] and *Bolden*.[10]  We need only apply those principles.

In *Gas Service Company, Inc. v. City of London*, the Kentucky Supreme Court reminded us that municipal governments have no liability "for acts which could be classified as 'the exercise of legislative or judicial or quasi-legislative or quasi-judicial functions.'"  687 S.W.2d 144, 148 (Ky. 1985) (citing *Haney v. City of Lexington*, 386 S.W.2d 738 (Ky. 1964)).  In *Bolden v. City of Covington*, the Supreme Court cited two cases that applied this principle.  803 S.W.2d 577, 580 (Ky. 1991).  They were *Commonwealth, Department of Banking & Securities v. Brown*, 605 S.W.2d 497 (Ky. 1980), addressing the alleged nonfeasance of government employees charged with inspection and regulation of two banks when they defaulted on their obligations to depositors, and *Grogan v. Commonwealth*, 577 S.W.2d 4 (Ky. 1979), the Beverly Hills Supper Club fire disaster in the City of Southgate, where city and state employees were charged with negligent failure to enforce laws and regulations establishing safety standards

---

[9] *Gas Service Co., Inc. v. City of London*, 687 S.W.2d 144 (Ky. 1985).  *Gas Service Company* "reinstated the rule pronounced in *Haney* [*v. City of Lexington*,] . . . that a municipality is subject to suit for 'ordinary torts,' but immunity remains for the 'exercise of legislative or judicial or quasi-legislative or quasi-judicial functions.'"  *Cabinet For Human Resources Commonwealth v. Poore*, 711 S.W.2d 498, 499 (Ky. App. 1986).

[10] *Bolden v. City of Covington*, 803 S.W.2d 577 (Ky. 1991).  Referencing "the terms 'quasi-judicial' and 'quasi-legislative' [which] have never been statutorily defined, . . . the supreme court . . . attempted in *Bolden* . . . to further define 'the area of activity' covered by these frequently cited terms of art . . . ."  *Ashby v. City of Louisville*, 841 S.W.2d 184, 188 (Ky. App. 1992).

for construction and use of buildings. *Id.* "In these cases[,] the government was not charged with having caused the injury, but only with having failed to prevent it by proper exercise of regulatory functions which have elements appearing quasi-judicial and quasi-legislative in nature." *Gas Service Co.*, 687 S.W.2d at 149.

The Supreme Court applied this same reasoning in *Bolden* to reverse a circuit court order finding the City of Covington directly liable "for failure . . . to enforce certain provisions of the City's Housing Code applying to fire safety violations." 803 S.W.2d at 578. No individual city employee was blamed. *Id.* at 579. The Court began by stating that "a careful reading of *Haney* [*v. City of Lexington*] makes it clear there are certain governmental activities which by their nature do not classify as tortious conduct even though a court might judge they were performed incompetently." *Id.* at 580. Noting a consistency with general statements of the law, the Court cited Sections 895B and 895C of the RESTATEMENT (SECOND) TORTS discussing both municipal immunity "and municipal *liability* for 'local government entities.'" *Id.* Repudiation of municipal immunity, as was done in *Haney v. City of Lexington*, *supra*, "does not establish liability for an act or omission that is otherwise privileged or is not tortious." *Id.* (quoting Sections 895B(4) and 895C(3)). Quoting a lengthier section of the Restatement, the Court said:

> "The mere fact that a person has been harmed by governmental action does not automatically mean that his

-37-

> damage was tortious. In the oft-quoted phrase of Justice Jackson dissenting, in *Dalehite v. United States*, (1953) 346 U.S. 15, 57: 'Of course, it is not a tort for government to govern.'" § 895B, Comment e, *Conduct not tortious.*

*Id.* We would add that this principle applies to claims of government *inaction* as well as government action. *Gas Service Co.*, 687 S.W.2d at 149 (deciding in favor of city against claim it "failed to prevent [injury] by proper exercise of regulatory functions").

The Supreme Court's bottom line was this – "Kentucky's decisions have repudiated municipal immunity, but this does not create liability for governmental activity that does not qualify as tortious." *Bolden*, 803 S.W.2d at 580.

This Court of Appeals followed the Supreme Court's guidance when it decided *Siding Sales, Inc. v. Warren County Water District*, 984 S.W.2d 490 (Ky. App. 1998). In *Siding Sales*, the appellant claimed the City of Bowling Green "negligently . . . failed to enforce local fire protection standards" resulting in the destruction of its building; water pressure to hydrants was insufficient to suppress a fire. *Id.* at 492. The Court cited CALGA, and then quoted *Grogan*, *supra*, saying a city

> is not to be held to the same standards of performance that would be required of a professional organization hired to do the job. If it were, it very well might hesitate to undertake them. A city cannot be held liable for its

> omission to do all the things that could or should have been done in an effort to protect life and property.

*Id.* at 493 (quoting *Grogan*, 577 S.W.2d at 5) (citation omitted). *See also Washington v. City of Winchester*, 938 S.W.2d 588, 589 (Ky. App. 1997) (rhetorically asking whether courts should recognize "a tort for improper inspection and enforcement of the housing code? We think not. . . . Without a theory of liability, the trial court had no alternative but to dismiss.").

As in these other cases, the City and GPD in this case took on a "regulatory function," *Brown*, 605 S.W.2d at 498, creation of the SRT, "which is different from any performed by private persons or in private industry, and where, if it were held liable for failing to perform that function, it would be a new kind of tort liability." *Gas Service Co.*, 687 S.W.2d at 149.

In summary, we repeat what we said in *Siding Sales*. "In the present case, we believe the City's role was regulatory in nature, as was the case in *Bolden*. As such, we agree with the trial court that the City is exempt from liability under these circumstances." *Siding Sales*, 984 S.W.2d at 493.

## CONCLUSION

For the foregoing reasons, we affirm, in part, and reverse, in part, and remand for further proceedings.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Elliott C. Miller
Thomas W. Miller
Elizabeth C. Woodford
Lexington, Kentucky

ORAL ARGUMENT FOR
APPELLANT:

Thomas W. Miller
Lexington, Kentucky

BRIEF FOR APPELLEES CITY OF
GEORGETOWN AND
GEORGETOWN POLICE
DEPARTMENT:

L. Scott Miller
Maureen C. Malles
Lexington, Kentucky

ORAL ARGUMENT FOR
APPELLEES CITY OF
GEORGETOWN AND
GEORGETOWN POLICE
DEPARTMENT:

L. Scott Miller
Lexington Kentucky

BRIEF AND ORAL ARGUMENT
FOR APPELLEE JAMES MICHAEL
WAGONER:

Jason Bell
Elizabethtown, Kentucky

BRIEF AND ORAL ARGUMENT
FOR APPELLEE JOSEPH
ENRICCO:

Jeffrey C. Mando
Jennifer L. Langen
Covington, Kentucky