RENDERED: MARCH 20, 2025
TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0079-DG

LOUISVILLE & JEFFERSON COUNTY                                   APPELLANT
METROPOLITAN SEWER DISTRICT


                        ON REVIEW FROM COURT OF APPEALS
V.                              NO. 2021-CA-0181
                  JEFFERSON CIRCUIT COURT NO. 18-CI-07082


JENNIFER ALBRIGHT, INDIVIDUALLY,                                 APPELLEE
AND AS ADMINISTRATRIX OF THE
ESTATE OF DAVID K. ALBRIGHT


**OPINION OF THE COURT BY CHIEF JUSTICE LAMBERT**

**<u>AFFIRMING</u>**


In this appeal, we address whether the Louisville and Jefferson County Metropolitan Sewer District (MSD) is entitled to municipal immunity under the Claims Against Local Governments Act (CALGA)[1] against Jennifer Albright's (Albright) claims against it in relation to the death of her minor child. The circuit court granted summary judgment in favor of MSD after finding that it qualified for immunity under CALGA, and the Court of Appeals reversed. After thorough review we hold that MSD, though subject to CALGA, is not entitled to immunity under the facts of this case. We accordingly affirm the Court of

---

[1] Kentucky Revised Statues (KRS) 65.200-65.2006.

Appeals, vacate the circuit court's summary judgment opinion and order, and remand this case to the circuit court for further proceedings.

## I. FACTS AND PROCEDURAL BACKGROUND

As this is an appeal from an entry of summary judgment, this Court's review provides no deference to the circuit court's assessment of the record or its legal conclusions. *See Hammons v. Hammons*, 327 S.W.3d 444, 448 (Ky. 2010) (citing *Malone v. Kentucky Farm Bureau Mut. Ins. Co.*, 287 S.W.3d 656, 658 (Ky. 2009)). Accordingly, in this section we provide only the facts that are necessary for context and provide a more thorough discussion of the record in Section II(C) of this Opinion.

At the time of the events at issue in this case Albright had been living in a residential subdivision known as Old Dorsey Place[2] in Louisville, Kentucky with her fifteen-year-old son David Albright (David) and her twelve-year-old son Maxwell Albright (Max) for six years. David attended Trinity High School and was an A and B average student who participated in the school's chorus and drumline. He also had an afterschool job at a bakery and was involved in the Boy Scouts.

Sometime around 6:30 p.m. on August 31, 2018, Albright and her children came home and noticed that the grass covered drainage swale in their backyard had filled with rain water to approximately ankle-deep. The swale carried water from right to left across Albright's backyard at 9805 Melissa Drive

---

[2] Also referred to as Foxboro Estates.

and continued across the yard of Albright's neighbor to the left at 9803 Melissa Drive. The swale then ended at the property line between 9803 and 9801 Melissa Drive where it emptied into a drainage pipe that was either eighteen inches or twenty-one inches in diameter, housed within a concrete headwall. The backyards of the properties on Melissa Drive abutted the backyards of the homes on Foxfire Drive. Accordingly, the swale simultaneously ran through the backyards of the homes located at 805, 803, and 801 Foxfire Drive, and the headwall was also in the backyard of the property at 801 Foxfire Drive. A concrete pad was in front of the headwall below the pipe entrance. It is undisputed that the swale and drainage pipe were part of a drainage easement owned by MSD.

Albright and her children decided they would play in the swale together for a little while before dinner. At first, Albright did not accompany the boys outside and instead filmed a video of them playing on her cellphone from inside her home. A few moments later Albright joined them outside. After a few minutes of splashing and running around in the swale, the trio moved down to the headwall. Albright stood on top of the headwall while David and Max played in the approximately 16-inch-deep water that had pooled at the pipe's opening. David, who was barefoot and standing upright, suddenly lost his footing and was swept feet-first towards the drainage pipe. Albright grabbed his hands and tried to prevent him from going into the pipe but was unable to maintain her grasp. David—who was five foot nine and weighed 162 pounds— was "sucked into" the drainage pipe. That pipe ran for four hundred and thirty

3

feet entirely underground, including two ninety degree turns, and contained no means for someone to extricate themselves if they became trapped inside. There were no warning signs in the vicinity of the pipe's opening, nor were there any safety measurements in place, such as a trash rack or safety grate that would have prevented someone from being swept into the pipe during a rain event. The pipe emptied into a detention pond that was also owned by MSD. David was located by first responders in that detention pond and was transported to a hospital where he died from his injuries on September 7, 2018.

In December 2018, Albright filed suit against MSD in both her individual capacity and as the administratrix of David's estate alleging negligence, negligence/failure to warn, negligence per se, attractive nuisance, negligent infliction of emotional distress, and loss of consortium. Of particular import, Albright's negligence claim asserted that MSD negligently maintained the drainage system and that it knew or should have known of the unsafe, defective, or dangerous condition created by it, while her claim for failure to warn contended that MSD failed to fulfill its duty to warn the public of the unreasonable danger created by the drainage system. Albright's primary contention was that MSD was negligent in failing to install a grate over the entrance to the pipe or, at the very least, for failing to warn the public of the pipe's dangers, of which it had or should have had knowledge. MSD's answer to Albright's complaint asserted several defenses including municipal immunity under CALGA.

4

After roughly one year of pre-trial proceedings that included numerous depositions, expert reports, and various other items of discovery, MSD filed a motion for summary judgment. MSD's motion asserted it was entitled to summary judgment, in pertinent part,[3] because it was immune from suit pursuant to CALGA. In particular, under KRS 65.2003, which states that a local government "shall not be liable for injuries or losses resulting from any claim arising from the exercise of. . . legislative or quasi-legislative authority." KRS 65.2003 then provides a non-exhaustive list of examples that include "[t]he adoption or failure to adopt any ordinance, resolution, order, regulation, or rule;" "[t]he exercise of discretion when in the face of competing demands, the local government determines whether and how to utilize or apply existing resources;" and the "failure to make an inspection." KRS 65.2003(3)(a), (d), and (e).

To support its assertion, MSD pointed to a guideline contained in its Drainage Manual that stated it would "not place grates on any existing drainage systems, or allow their use in newly installed drainage systems where the potential for flooding damage or a safety hazard exists." MSD claimed that

---

[3] MSD also asserted entitlement to summary judgment based on its assertions that David was a trespasser on MSD's drainage easement to whom it owed no duty, and that the attractive nuisance doctrine did not apply because of David's age and intelligence.

Though rendered unnecessary by the circuit court's finding of immunity under CALGA, the circuit court found that genuine material of issues of fact existed regarding whether David was a trespasser or was on MSD's easement by implied invitation, whether David interfered with MSD's easement in such a way that he could be deemed a trespasser, and whether the attractive nuisance doctrine was applicable.

this guideline was implemented because the placement of a grate creates a potential for flooding during rain events due to debris becoming trapped on the outside of the grate. This in turn can cause property damage and danger to any MSD employees or customers who attempt to remove the debris. In addition, MSD claimed that it also took its limited resources into consideration when implementing its no-grate guideline. It was undisputed that, pursuant to this guideline, MSD would flatly refuse to put a grate over any of its pipes, preexisting or new, under any circumstances.

Albright's response to MSD's motion for summary judgment asserted that MSD did not qualify as a "local government" under CALGA. And, even if it did, it did not meet CALGA's requirements for immunity. She argued that the same section of CALGA cited by MSD also stated that "[n]othing contained in this subsection shall be construed to exempt a local government from liability for negligence arising out of acts or omissions of its employees in carrying out their ministerial duties." KRS 65.2003(3). She argued that the common law and CALGA placed a ministerial duty on municipal corporations such as MSD to non-negligently construct, maintain, and repair their sewer systems and that MSD had been grossly negligent in failing to satisfy that ministerial duty. She contended that the pipe at issue was unreasonably dangerous in a way that would not be apparent to a lay person based on both its design and location and that it therefore needed maintenance or repair in the form of a grate.

Albright further argued that MSD blindly followed its no-grate guideline without considering any of the factors that industry standards required them to consider, and that those same industry publications provide that a properly designed grate actually reduces the risk of flooding. Albright asserted that neither the Drainage Manual nor the no-grate guideline itself had ever been adopted by MSD's Board and deposition testimony from multiple MSD employees clearly showed it was not an MSD "policy." Further, MSD's claim that the no-grate guideline was implemented based on a consideration of MSD's resources was demonstrably false, as the Drainage Manual explicitly says its principles are to be implemented without consideration of MSD's resources.

The circuit court found that MSD met the definition of a "local government" under CALGA and that it was entitled to immunity. It reasoned the pipe system that killed David was "functioning as intended" and was therefore not in need of maintenance or repair, and that the industry standards relied upon by Albright did not impose an absolute, certain, or imperative duty on MSD to place a grate, but rather only represented best practices. It concluded that "[t]he decision MSD made to not install grates over existing drainage pipes [fell] within its discretionary rulemaking authority under common law [and] CALGA" and that MSD was therefore entitled to immunity under subsections (a), (d), and (e) of KRS 65.2003(3).

Albright appealed the circuit court's ruling to the Court of Appeals, and a unanimous panel affirmed in part, reversed in part, and remanded for further

proceedings. *Albright v. Louisville & Jefferson Cty. Metro. Sewer Dist.*, 2021-CA-0181-MR, 2023 WL 324311 (Ky. App. Jan. 20, 2023). The Court of Appeals agreed with the circuit court's determination that MSD met the definition of "local government" provided in KRS 65.200(3) and was therefore an entity that could be covered under CALGA. *Id.* at *5. Nevertheless, it disagreed with the circuit court's determination that MSD was entitled to immunity based on the facts of this case and that its adoption of a guideline forbidding the placement of grates over its drainage pipes did not arise out of its legislative or quasi-legislative authority. *Id.* at *5-*9.

We granted MSD's subsequent motion for discretionary review to address whether it is entitled to immunity from Albright's claims under CALGA. Additional facts are discussed below where necessary.

## II. ANALYSIS

### A. Standard of Review

The sole issue presented by this appeal is whether the circuit court erred by granting summary judgment in favor of MSD based on its conclusion that MSD was entitled to municipal immunity against Albright's claims under CALGA.

Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

8

and that the moving party is entitled to a judgment as a matter of law." CR[4]

56.03 "[T]his Court has repeatedly admonished that the rule must be

cautiously applied" and that it "is not a substitute for trial." *Steelvest, Inc. v.*

*Scansteel Serv. Ctr., Inc.,* 807 S.W.2d 476, 480 (Ky. 1991). As ruling on a

motion for summary judgment does not require a trial court to make findings

of fact, but rather requires it to examine the record and determine whether a

material issue of fact exists, "we generally review the grant of summary

judgment without deference to either the trial court's assessment of the record

or its legal conclusions." *Hammons,* 327 S.W.3d at 448. Moreover, we must

review the record "in a light most favorable to the party opposing the motion for

summary judgment," in this case Albright, and resolve all doubts in her favor.

*Steelvest,* 807 S.W.2d at 480.

## B. MSD is a "local government" under CALGA.

Although Albright does not challenge the Court of Appeal's ruling that

MSD meets the definition of a "local government" under CALGA, the guidance

from this Court has been inconsistent on that point and we now clarify the law

regarding the potential availability of municipal immunity for entities like MSD.

CALGA defines "local government" as "any city incorporated under the

law of this Commonwealth, the offices and agencies thereof, any county

government or fiscal court, any special district or special taxing district created

or controlled by a local government." KRS 65.200(3). Formerly, the General

---

[4] Kentucky Rule of Civil Procedure.

Assembly provided a definition of "special district" under KRS 65.005(2)(a), which stated:

> "Special district" means any agency, authority, or political subdivision of the state which exercises less than statewide jurisdiction and which is organized for the purpose of performing governmental or other prescribed functions within limited boundaries. It includes all political subdivisions of the state except a city, a county, or a school district.

However, this definition is no longer applicable. Instead, KRS 65.005(1) provides:

> The provisions of this section shall apply prior to July 1, 2014. On and after July 1, 2014, the provisions of this section shall no longer apply; instead the provisions of KRS 65A.010 to 65A.090 shall apply. **Special districts** shall cooperate with the Department for Local Government and the Auditor of Public Accounts to ensure an orderly transition from the reporting requirements of this
>
> section to the reporting requirements of KRS 65A.010 to 65A.090. Notwithstanding the dates established by this subsection, the provisions of this section and KRS 65A.010 to 65A.090 shall be administered such that the registration required by KRS 65A.090(1) occurs as required by that subsection, and there is no gap in reporting by entities subject to this section and KRS 65A.010 to 65A.090 as the transition occurs.

(Emphasis added). Currently, there is no statutory definition of "special district," and that term instead appears to have been replaced with "special purpose governmental entity" as defined by KRS 65A.010(9)(a):

> "Special purpose governmental entity" or "entity" means any agency, authority, or entity created or authorized by statute which:
>
> 1. Exercises less than statewide jurisdiction;
>
> 2. Exists for the purpose of providing one (1) or a limited number of services or functions;

10

3. Is governed by a board, council, commission, committee, authority, or corporation with policy-making authority that is separate from the state and the governing body of the city, county, or cities and counties in which it operates; and

4. a. Has the independent authority to generate public funds; or

b. May receive and expend public funds, grants, awards, or appropriations from the state, from any agency, or authority of the state, from a city or county, or from any other special purpose governmental entity.

We conclude that the definition of "special district" under KRS 65.005(2)(a) and the definition of "special purpose governmental entity" under KRS 65A.010(9)(a) are substantially similar. Indeed, under KRS 65A.010(9)(c)(7), the General Assembly gives one such example of a special purpose governmental entity as "[s]anitation, sewer, waste management, and solid waste services." It is therefore indisputable that the General Assembly intended local entities like MSD that provide sewer services to be considered special purpose governmental entities.

The General Assembly effectuated these changes by the passage of HB 1[5] in the 2013 regular session. This amendment does not appear intended to change how these entities are to be treated under CALGA. HB 1 is entitled "Special Districts—Registers and Registries—Audits and Auditors," and the preamble is as follows:

AN ACT relating to special purpose governmental entities, making an appropriation therefor, and declaring an emergency.

WHEREAS, special purpose governmental entities exist to serve a public purpose and must be subject to standards of accountability

---

[5] Act of Mar. 21, 2013, ch. 40, 2013 Ky Acts 197 (enacting KRS Chapter 65A).

11

so that the public, other local governmental entities, and state government can be apprised of their status and activities; and

WHEREAS, for many years it has been impossible to compile a complete and accurate list of all the special purpose governmental entities operating in the Commonwealth, or to ascertain basic information about how those entities are operated, where they receive their funding, and how they expend their resources; and

WHEREAS, the General Assembly, in 12 RS HCR 53, directed the Interim Joint Committee on Local Government to study, during the 2012 Interim, special districts' fiscal, administrative, and ethical issues in light of audits conducted by the Auditor of Public Accounts; and

WHEREAS, numerous concerns relating to the accountability and transparency of special purpose governmental entities were recently highlighted in "Ghost Government A Report on Special Districts in Kentucky" issued by the Auditor of Public Accounts on November 14, 2012; and

WHEREAS, the General Assembly intends, by enacting this legislation, to improve the public accountability and transparency of all special purpose governmental entities in the Commonwealth, for the benefit of the people whom these entities serve[.]

We discern from the language of the preamble of HB 1 (2013) that the purpose of this bill was not to alter, abolish, or remove the term special district from the protections under CALGA. Rather, it was to institute some financial oversight over, and encourage greater transparency, from these entities.

We now turn to the caselaw pertaining to whether a sewer district qualifies as a special district. In *Coppage Constr. Co., Inc. v. Sanitation Dist. No. 1,* 459 S.W.3d 855 (Ky. 2015), we held that Sanitation District 1 was a special

district.[6]  Despite our holding that Sanitation District 1 was a special district under KRS 65.005, our predecessors on this Court found that it was not entitled to sovereign immunity.[7]  In deciding that Sanitation District 1 was not immune from suit we used the analysis as set forth in *Comair, Inc. v. Lexington—Fayette Urban County Airport Corp.,* 295 S.W.3d 91 (Ky. 2009).

From *Coppage:*

> In our recent *Comair* decision, this Court provided guidance for determining whether a "public" entity is entitled to sovereign immunity by setting forth a two-prong analysis.  295 S.W.3d at 91. First, the courts must look to the origin of the public entity, specifically: "was [the entity in question] created by the state or a county [which are entitled to immunity], or a city [which is not entitled to immunity except in the legislative and judicial realms]?" *Id.* at 99.  The second and "more important" inquiry is whether the entity exercises a "function integral to state government." *Id.* at 99.

459 S.W.3d at 859.  Ultimately, as to the first prong under *Comair* this Court held that Sanitation District 1 was not created by the state nor the counties in which it operated, rather

> it was created pursuant to KRS Chapter 220's predecessor, Chapter 148 of the 1940 Kentucky Acts "… by petition of about seventeen incorporated areas and communities located in northern Kentucky." *City of Covington v. Sanitation Dist. No. 1 of Campbell and Kenton Counties,* 301 S.W.2d 885, 886 (Ky. 1957).  And while [Sanitation District] 1 correctly asserts that such petition must be approved by the county board of health, KRS 220.040(1), a sanitation district *cannot* be created without the "direct solicitation or … the free consent" of the affected landowners in the form of a petition signed by individuals or the governing body of their

---

[6] Sanitation Districts are created through KRS 220, while Metropolitan Sewer Districts are created through KRS 76.  In *Coppage,* we found this a "distinction without a difference."  459 S.W.3d at 863.

[7] In *Coppage,* this Court also took no notice of the change from "special district" to "special purpose government entity."

municipality. *See Comair,* 295 S.W.3d at 100. Simply put, no county can impose a sanitation district upon its citizens under KRS Chapter 220 (or its predecessor), and none of the counties involved in this litigation "created" [Sanitation District] 1.

*Id.* at 861. As to the second prong of the *Comair* analysis, whether a sanitation district performs an integral state function, this Court held that sewer services were a local proprietary function not integral to state government. We based our decision largely on our holding in a case involving the very same entity in this case: MSD. In *Calvert Invs., Inc. v. Louisville & Jefferson Cty. Metro. Sewer Dist.,* 805 S.W. 2d 133 (Ky. 1991), we determined that MSD was not entitled to sovereign immunity largely because it performs a local function similar to a private corporation. From *Coppage*:

> [S]ewer districts are established as special districts "to carry out a limited public purpose in a local area," *id.* at 135, and, unlike counties or school districts, perform "services similar to a private corporation[.]" *Id.* at 138. With these characteristics in mind, the *Calvert* Court had little difficulty concluding that MSD, a municipal corporation designated to perform a local function, was not entitled to sovereign immunity. *Id.*

459 S.W.3d at 862–63 (discussing *Calvert Invs., Inc. v. Louisville & Jefferson Cty. Metro. Sewer Dist.,* 805 S.W. 2d 133 (Ky. 1991)).

So, if one were to determine from the caselaw alone whether MSD is entitled to sovereign immunity in the case at bar, one must answer in the negative.[8] A curious omission occurred in these line of cases, however. Not

---

[8] Even more recently this Court confirmed in its analysis, that MSD is not entitled to sovereign immunity but once again did not undertake any analysis regarding CALGA, instead relying on *Coppage* and *Comair. Louisville & Jefferson Cnty. Metro. Sewer Dist. v. Hill,* 607 S.W.3d 549, 554–55 (Ky. 2020).

14

once in these several cases did this Court undertake an analysis of CALGA, nor was it even mentioned despite that it was in effect at the time all three cases were decided. Bearing in mind that CALGA is an abbreviation of Claims Against Local Governments Act, and that special district is included in the definition of local government,[9] it is confusing, to say the least, for *Calvert, Comair,* and *Coppage* to cast local governments, which "carry out a limited public purpose in a local area," beyond the pale of immunity because they are not creatures of the state and do not perform an integral state-wide function. Whatever the reason for this omission, this Court cannot ignore the implications of CALGA on the present case despite this Court's previous jurisprudence and the General Assembly's duly enacted provisions of CALGA, having passed each other like ships in the night, seemingly unaware of the other's presence.

To add to the confusion surrounding this issue, the Court of Appeals in one case held that a local water company enjoyed municipal immunity. *Siding Sales, Inc. v. Warren Cty. Water Dist.*, 984 S.W.2d 490 (Ky. App. 1998).[10] And it is one of the few cases that analyzed the immunity issue through the lens of CALGA. Yet, more recently this Court adopted the holding of the Court of Appeals which held a local water company was not immune from suit. *N. K. Water Dist. v. Carucci,* 600 S.W.3d 240 (Ky. 2020). This case overruled a Court

---

[9] See the discussion above regarding special districts and special purpose governmental entities.

[10] It is this case where the Court of Appeals based its opinion that MSD is a covered entity under CALGA.

of Appeals case wherein it decided that the South Woodford Water District did enjoy immunity. *S. Woodford Water Dist. v. Byrd*, 352 S.W.3d 340 (Ky. App. 2011). The reasoning behind our decision in *Carucci* was again based on our holding in *Coppage.* We held that the water company did not perform an integral state function. *Carruci*, 600 S.W.3d at 244. But absent from *Carruci* is any mention or analysis of CALGA.

Despite the considerable weight of the caselaw finding otherwise, this Court must take CALGA into account, howsoever belatedly, and we now hold that MSD is a special district or special purpose governmental entity and may be entitled to municipal immunity under CALGA.

## C. Though MSD is a local government under CALGA, it is not entitled to municipal immunity here.

Before this Court, MSD renews its assertion that its decision to not place grates over any of the drainage pipes for which it is responsible is entitled to immunity under CALGA because it arose out of the exercise of its legislative or quasi-legislative authority. In response, Albright contends her allegation that MSD failed to non-negligently maintain or repair the pipe at issue is an assertion that it failed to fulfill a ministerial duty and MSD is therefore not entitled to immunity against it. For the reasons that follow, we agree with Albright.

### 1) MSD has a ministerial duty to maintain and repair its sewer and water systems.

Any discussion of modern municipal immunity jurisprudence in Kentucky must begin with *Haney v. City of Lexington*, 386 S.W.2d 738 (Ky.

16

1964). Prior to *Haney*, our courts adhered to the rule of municipal immunity from liability sounding in tort, and our jurisprudence's sole means to "lessen the severity of the rule of municipal immunity" to individuals harmed by the negligence of a municipal corporation was by drawing a distinction between "functions of the municipal corporation that purportedly were governmental or public and those thought to be proprietary or private." *Id.* at 739-40. Municipal liability was denied in cases involving a governmental function but was imposed in situations involving a proprietary action.[11] *Id.* at 740. *Haney* was a sea change, as it separated the doctrine of municipal immunity from sovereign immunity and abolished it apart from the explicit exceptions of a municipality's exercise of its legislative, judicial, quasi-legislative, or quasi-judicial authority. *Id.* at 742.

In *Haney*, the estate of a seven-year-old girl who drowned in a pool operated by the city of Lexington filed a negligence claim against it. *Id.* at 739. The trial court found the city was entitled to municipal immunity from the claim because its operation of the pool was a governmental function and entered summary judgment in its favor. *Id.* at 738-39. In addressing the estate's appeal, the Commonwealth's then-highest court expressed its clear disdain for the doctrine of municipal immunity which it called a "legal anachronism" without a rational or constitutional basis that "existed only by the force of inertia" and *stare decisis*. *Id.* at 739-40. It expressed a similar

---

[11] *See, e.g.*, *V. T. C. Lines, Inc. v. City of Harlan*, 313 S.W.2d 573 (Ky. 1957), *overruled by Haney*.

17

contempt for our court system's attempt to create "escape hatches" from municipal immunity by distinguishing between governmental and proprietary functions, which it concluded was "contrived and without sensible basis[,]" "difficult to understand[,]" and led to incongruous results from one case to another. *Id.* at 740.

Accordingly, the *Haney* Court announced that it was "[receding] from prior decisions which hold municipal corporations immune from liability for ordinary torts." *Id.* at 742. The sole exception for its new rule of municipal liability was a municipality's "exercise of legislative or judicial or quasi-legislative or quasi-judicial functions." *Id.* The Court concluded by adopting language from a Wisconsin Supreme Court opinion regarding the scope of its abrogation of municipal immunity:

> Perhaps clarity will be afforded by our expression that henceforward, **so far as governmental responsibility for torts is concerned, the rule is liability—the exception is immunity**. In determining the tort liability of a municipality it is no longer necessary to divide its operations into those which are proprietary and those which are governmental. Our decision does not broaden the government's obligation so as to make it responsible for all harms to others; it is only as to those harms which are torts that governmental bodies are to be liable by reason of this decision.

*Id.* (emphasis added) (quoting *Holytz v. City of Milwaukee*, 115 N.W.2d 618, 625 (Wis. 1962)). The Court vacated the trial court's summary judgment order and remanded for further proceedings. *Id.*

Twenty-one years after *Haney*, this Court doubled down on the abolishment of municipal immunity in favor of municipal liability and expounded on what qualifies as "the exercise of legislative or judicial or quasi-

18

legislative or quasi-judicial functions" in *Gas Service Co., Inc. v. City of London,* 687 S.W.2d 144 (Ky. 1985). In that case, a gas company was found to be liable to several injured plaintiffs after its gas line exploded in the city of London. *Id.* at 145. The gas company in turn sought indemnity against the city on the basis that the city had installed sewer lines in close proximity to the company's gas lines and thereafter negligently repaired those sewer lines in a manner that caused the explosion. *Id.* The trial court dismissed the indemnity claim on the basis that the city was entitled to municipal immunity, and the Court of Appeals affirmed. *Id.* This Court granted discretionary review to "consider once again the legal morass that has generated around the subject of municipal immunity[.]" *Id.*

The *Gas Service* Court highlighted that *Haney* "regarded municipal immunity as a judicially created monstrosity that should be judicially destroyed." *Id.* at 147. Yet, in the intervening decades since *Haney* was rendered, several opinions had "so circumscribed its language that we have. . . regressed beyond its starting point." *Id.* 146-47. In particular, the trial court's grant of summary judgment in favor of the city of London in the case before it demonstrated

> that this monstrosity is not only alive and well, but grown to such proportions that it provides immunity for negligence in repair and maintenance of sewers, a function previously regarded as one proprietary in nature and not protected by municipal immunity. *See City of Paris v. Baldwin Bros.*, 169 Ky. 802, 185 S.W. 144 (1916), *City of Frankfort v. Buttimer*, 146 Ky. 815, 143 S.W. 410 (1912), *Toebbe v. City of Covington*, 145 Ky. 763, 141 S.W. 421 (1911) and *Town of Central Covington v. Beiser*, 122 Ky. 715, 92

19

S.W. 973 (1906), all premising liability for damages on condition of city sewer facilities.

*Id.* at 147. *See also City of Maysville v. Brooks,* 140 S.W. 665, 668 (Ky. 1911) (holding "the obligation to establish and open sewers is a legislative duty, while the obligation to keep them in repair is ministerial."); *Prather v. City of Lexington,* 52 Ky. 559, 561 (1853) ("And where a city corporation is bound to keep the . . . sewers of the city in proper repair, it is liable to damages if any person be injured by its neglect to have such repairs made.").

In other words, any alleged negligence by a municipality in the maintenance or repair of its sewer system had always been subject to liability, even before *Haney*'s abolishment of municipal immunity. 687 S.W.2d at 147. Yet, because subsequent cases such as *City of Louisville v. Louisville Seed Co.,* 433 S.W.2d 638 (Ky. 1968); *Frankfort Variety, Inc. v. City of Frankfort,* 552 S.W.2d 653 (Ky. 1977); and *City of Russellville v. Greer,* 440 S.W.2d 269 (Ky. 1968)[12] had retreated from the holding in *Haney* by attempting to install yet another arbitrary distinction—this time between whether a given activity is or is not "an ultimate function of government"—the trial court in *Gas Service* had been able to conclude that the city was immune from liability for its alleged negligence in maintaining or repairing its sewer system. *Id.* at 148. The Court went so far as to say that it was

> understandable if the movant in the present case should wonder how we arrived in a situation where he could have recovered for damages from the city's negligent maintenance and repair of the sewer system when municipal immunity was the rule and liability

[12] All three cases were overruled by *Gas Service.*

20

the exception, but can no longer recover now when liability is supposedly the rule and immunity the exception.

*Id.* at 147.

Accordingly, the *Gas Service* Court once again made its intention to abolish municipal immunity except in very limited circumstances clear:

The concept of liability for negligence expresses **a universal duty owed by all to all**. The duty to exercise ordinary care commensurate with the circumstances is a standard of conduct that **does not turn on and off depending on who is negligent. With a municipal corporation as with all other legal entities, the question is not whether such a duty exists, but whether it has been violated and what are the consequences.** Constitutionally, statutorily, or by court decisions, on occasion we excuse the nonperformance of this duty, but no purpose is served by denying its existence.

. . .

The only line drawn against municipal liability for torts in *Haney* was "the exercise of legislative or judicial or quasi-legislative or quasi-judicial functions." 386 S.W.2d at 742. Liability in the fact situations in *Louisville Seed Co.* and in *Frankfort Variety* is not excused by this limited exception. **Those cases, and others we have discussed in this opinion applying municipal immunity in reliance on them, are overruled. The functions being carried out by municipal employees in these cases do not qualify for municipal immunity under the doctrine laid down in *Haney*.** In such situations if negligence is proved, liability will follow.

*Id.* at 148-49 (emphasis added).

Thus, the *Gas Service* Court effectively held that the municipalities' actions in *Louisville Seed* and *Greer*[13] would **not** have been entitled to immunity. *Id.* at 149. That conclusion is significant to the case now before us

---

[13] *Greer* was discussed in the *Gas Service* opinion, *id.* at 148, and *Greer* relied on *Louisville Seed* to impose municipal immunity. 687 S.W.2d at 270-71.

21

because in *Louisville Seed* the plaintiff alleged the city was liable for its "negligence in its failure to install gates in the municipal flood wall system," 433 S.W.2d at 639, and in *Greer* the plaintiff alleged that the city's "negligent failure to maintain a STOP sign. . . was the proximate cause of [his motor vehicle] collision." 440 S.W.2d at 270. These omissions are analogous to MSD's alleged negligence in failing to warn of and/or failing to place a grate over the pipe at issue in this case.

With its dedication to the abolishment of municipal immunity reaffirmed, the *Gas Service* Court then went on to address "what activities are excluded from liability in tort imposed on municipal corporations in *Haney* by the exception made for the exercise of. . . quasi-legislative or quasi-judicial functions." 687 S.W.2d at 149. The Court identified two cases decided since *Haney* that had reasonably classified the acts or omissions at issue as immune under this limited exception to liability: *Commonwealth, Dept. of Banking and Sec. v. Brown*, 605 S.W.2d 497 (Ky. 1980) and *Grogan v. Commonwealth*, 577 S.W.2d 4 (Ky. 1979). 687 S.W.2d at 149. *Brown* involved "the alleged malfeasance of government employees charged with inspection and regulation of American Building and Loan Association and of Prudential Building & Loan Association when they defaulted on their obligations to depositors," while the *Grogan* litigation stemmed from "the Beverly Hills Supper Club fire disaster in the City of Southgate, where city and state employees were charged with negligent failure to enforce laws and regulations establishing safety standards for construction and use of buildings." *Id.*

22

The Court acknowledged that *Brown* and *Grogan* did not address the exceptions to municipal liability in the precise context of which it concerned itself in *Gas Service* but nevertheless concluded that both were "cases where the 'government takes upon itself a regulatory function,' . . . which is different from any performed by private persons or in private industry, and where, if it were held liable for failing to perform that function, it would be a new kind of tort liability." *Id.* It then held:

> We deem the limitation expressed in *Haney* by the terms "quasi-judicial and quasi-legislative functions" as directed at the type of regulatory activity represented by [*Brown* and *Grogan*]. In these cases the government was not charged with having caused the injury, but only with having failed to prevent it by proper exercise of regulatory functions which have elements appearing quasi-judicial and quasi-legislative in nature.

*Id.* The Court accordingly held that the city of London's alleged negligence in the repair of its sewer lines was not entitled to immunity and remanded for further proceedings. *Id.* at 150.

Former Justice Wintersheimer filed a separate concurring opinion in *Gas Service* in which he called upon the General Assembly to enact "a comprehensive tort claims act which could be applicable to all units of government." *Id.* at 152. In July 1988, three years after *Gas Service* was rendered, the General Assembly answered Justice Wintersheimer's call to action by enacting CALGA.[14] CALGA directs that

> (1) Every action in tort against any local government in this Commonwealth for death, personal injury or property damages proximately caused by:

[14] KRS 65.200 to KRS 65.2006.

23

(a) Any defect or hazardous condition in public lands, buildings or other public property, including personalty;

(b) Any act or omission of any employee, while acting within the scope of his employment or duties; or

(c) Any act or omission of a person other than an employee for which the local government is or may be liable

shall be subject to the provisions of [CALGA].

KRS 65.2001(1)(a)-(c). CALGA defines "action in tort" as "any claim for money damages based upon negligence, medical malpractice, intentional tort, nuisance, products liability and strict liability, and also includes any wrongful death or survival-type action." KRS 65.200(1). And provides that "[t]he amount of damages recoverable against a local government for death, personal injury or property damages arising out of a single accident or occurrence. . . shall not exceed the total damages suffered by plaintiff, reduced by the percentage of fault including contributory fault. . . if any." KRS 65.2002.

The Act further explicitly states that it was not intended to alter or expand the common law that existed at the time of its enactment, i.e., *Gas Services*, *Haney*, etc., by stating:

Except as otherwise specifically provided in KRS 65.2002 to 65.2006, all enacted and case-made law, substantive or procedural, concerning actions in tort against local governments

shall continue in force. No provision of KRS 65.2002 to 65.2006 shall in any way be construed to expand the existing common law concerning municipal tort liability as of July 15, 1988, nor eliminate or abrogate the defense of governmental immunity for county governments.

24

KRS 65.2001(2).  Ostensibly based on its desire to codify the common law rather than modify it, CALGA goes on to provide, pertinent to this case, that

> Notwithstanding KRS 65.2001, a local government shall not be liable for injuries or losses resulting from:
> . . .
>
> (3) **Any claim arising from the exercise of judicial, quasi-judicial, legislative or quasi-legislative authority** or others, exercise of judgment or discretion vested in the local government, which shall include by example, but not be limited to:
>
> (a) The adoption or failure to adopt any ordinance, resolution, order, regulation, or rule;
>
> . . .
>
> (d) The exercise of discretion when in the face of competing demands, the local government determines whether and how to utilize or apply existing resources; or
>
> (e) Failure to make an inspection.
>
> **Nothing contained in this subsection shall be construed to exempt a local government from liability for negligence arising out of acts or omissions of its employees in carrying out their ministerial duties**.

KRS 65.2003(3)(a), (d)-(e) (emphasis added).

Following the enactment of CALGA, our jurisprudence never retreated from the tenet that a municipal corporation's responsibility to non-negligently construct, maintain, and repair its sewer system is a ministerial duty[15] and that an alleged failure to fulfill that duty is not entitled to immunity as

---

[15] Ministerial acts are those which require no independent exercise of discretion or judgment unlike legislative or quasi-legislative acts which require deliberation or debate.  *Ministerial Act,* BLACK'S LAW DICTIONARY (12th ed. 2024).

demonstrated by *Mason v. City of Mt. Sterling*, 122 S.W.3d 500 (Ky. 2003) and *City of Frankfort v. Byrns*, 817 S.W.2d 462 (Ky. App. 1991).

In *Byrns*, flooding caused damage to the plaintiffs' home several times in the 1970s because of a drainage ditch owned by the city of Frankfort that would overflow during rain events. *Id.* at 463. Because of the flooding, the city placed a moratorium on new construction in the area that was lifted in 1980 when the city invested one million dollars into a project to enlarge the capacity of the drainage system. *Id.* That drainage project was unsuccessful, and the plaintiffs' home continued to sustain flood damage. *Id.* This prompted them to file suit against the city alleging "negligence with respect to the installation, design, and maintenance" of the drainage system that served their subdivision and that the city "was negligent in allowing excessive commercial and residential development in the area without providing adequate provisions for proper drainage." *Id.* A jury found in favor of the plaintiffs and the city appealed arguing that the design and construction of the drainage system, as well as the decision to build it, were discretionary and therefore entitled to immunity. *Id.* at 464.

The Court of Appeals rejected the city's argument and instead applied *Gas Services* and *Haney* to hold that the plaintiffs' claims concerned the city's ministerial duties and the city was therefore not entitled to immunity. *Id.* The court emphasized that *Gas Services* "severely restricted the rule of immunity for municipalities[,]" and in doing so "it emphasized again the line of prior decisions which held cities liable for negligence, including negligence for

26

defective conditions of city sewer facilities." *Id.* (citing *Buttimer* and *Beiser, supra*). The Court of Appeals accordingly held that "[o]nce the City of Frankfort made a decision to design and construct the system in question, a decision which was within its discretionary capacity, its subsequent actions in designing and building the system were ministerial" and it was not entitled to immunity. *Id.* at 464-65.

Several years later, in *Mason,* this Court reversed a trial court's grant of summary judgment in favor of the city of Mt. Sterling and two private land owners, Glenn Potts and Denny and Debra Morton, on a claim related to the death of a nine-year-old boy who died after being swept away by floodwaters into a submerged and non-visible storm sewer system. 122 S.W.3d at 503.

Potts owned two freestanding apartment buildings that shared a common parking lot; he had privately constructed a drainage system at the back of the parking lot that consisted of a headwall with a 30-inch pipe and a 48-inch pipe. *Id.* at 503-04. Potts' parking lot flooded during a heavy rain event and several children were sliding down a bank into an area of pooled water at the back of the parking lot. *Id.* at 503. The decedent had attempted to join those children and stepped over Potts' headwall, which was covered by muddy, opaque water. *Id.* He was sucked into the 48-inch pipe in the headwall at which point his body traveled under the parking lot into a privately built holding chamber which connected to a culvert owned by the city. *Id.* at 504. The child's body then passed through the city's culvert to another holding chamber which connected to a privately built pipe on the Mortons' property.

27

*Id.*

The child's estate filed a wrongful death suit against the city, Potts, and the Mortons. *Id.* at 503. The estate introduced expert testimony tending to show that various parts of the drainage system, both the privately and publicly owned portions, were in disrepair or were otherwise defective in a manner that exacerbated flooding issues in that area. *Id.* at 504. The trial court granted summary judgment in favor of the city and the private landowners, the estate appealed, and this Court reversed. *Id.* at 503. The *Mason* Court first rejected the city's contention that since it did not construct the entire sewer system it could not be held liable, particularly in light of the fact that the decedent was sucked into a pipe that belonged to a private landowner. *Id.* at 505. The Court held that "by structurally tying the private system into the public system, the City acquired a duty to properly maintain and repair the sewer system as a whole." *Id.* With that established, this Court went on to hold that the city was not entitled to municipal immunity:

> Municipalities in Kentucky are not immune from tort liability, except in the limited circumstances when they are exercising legislative or judicial or quasi-legislative or quasi-judicial functions. *See* [*Gas Service, Haney*]; *Ashby v. City of Louisville*, Ky. App., 841 S.W.2d 184 (1992). In delineating what constitutes legislative action, this Court has long held that a municipality's decision to establish or open a sewer system is a legislative function entitled to immunity protection. [*Brooks*, 140 S.W. at 668]. However, once a municipality establishes or opens a sewer, it has a ministerial duty to non-negligently construct, maintain, and repair the sewer system. *Ibid.*

28

*Id.* at 504-05. The Mason Court concluded that "[w]hether the City met this duty in a non-negligent manner[,]" as well as a host of other issues in the case, "[were questions] of fact for the jury." *Id.* at 506.

In addition to our post-CALGA adherence to the rule that a municipality has a ministerial duty to non-negligently maintain and repair its sewer systems, our courts also continued to apply the definition of acts or omissions that "arise from the exercise of judicial, quasi-judicial, legislative, or quasi-legislative" established in *Gas Service,* i.e., that

> [t]he principle of no liability in this *narrow* and *limited* area does not rest upon tort immunity but upon the fact that the incompetent performance of judicial and legislative acts is not classified as actionable negligence in the tort system. Tort liability does not extend to "cases where the 'government takes upon itself a regulatory function,' [*Brown,* 605 S.W.2d at 498], which is different from any performed by private persons or in private industry, and where, if it were held liable for failing to perform that function, it would be a new kind of tort liability."

*Bolden v. City of Covington,* 803 S.W.2d 577, 581 (Ky. 1991). And, "that quasi-judicial and quasi-legislative functions involve regulatory types of activities as to which 'the government was not charged with having caused the injury, but only with having failed to prevent it by proper exercise of regulatory functions which have elements appearing quasi-judicial and quasi-legislative in nature.'" *Ashby v. City of Louisville,* 841 S.W.2d 184, 188 (Ky. App. 1992), *holding modified on other grounds by Gaither v. Justice & Pub. Safety Cabinet,* 447 S.W.3d 628 (Ky. 2014).

In *Bolden,* this Court held that the city of Covington was immune from claims arising out of the exercise of its discretion in connection with housing

inspections for fire code violations because it was an exercise of discretion that was quasi-judicial in nature. *Bolden*, 803 S.W.2d at 581. The regulatory process utilized by the city was described as follows:

> ordinances, reports of safety and fire violations, such as that from the unidentified tenant in this case, are sent to the City Director of Housing Development, who then sends inspectors to investigate. When confirmed, no action can be taken except according to the "Complaint Procedure" prescribed in § 152.07 of the Housing Code. The Code provides for the Director to then make administrative decisions, including whether the "structure is unfit for human habitation." In this case, under subparagraph (F) if "the owner fails to comply with an order to repair ... the Director ... may cause the structure to be closed ... and placarded," and under subparagraph (G), at any point where he makes a further finding that "conditions ... are an imminent and immediate threat to the safety of persons occupying the structure," "he shall cause" the building to be closed and placarded.

*Id.* Based on this process, the Court held that

> Legal liability flowing from the existence of these fire and safety violations rests on the owner or other person in possession and control of the building. The duties assigned by the ordinances to the Director and city inspectors are to find or confirm violations, and to decide what needs to be done, whether repairs or placarding the building. The judicial nature of these decisions is underscored by the fact that there are avenues of appeal from the decision of the Director to a reviewing authority and to the courts. There is no more legal liability in this situation for the City than there would be where a judge fails to make a decision or makes a wrong one. The trial court's decision that the City must respond in tort in this situation was in error, not because the City enjoys immunity from tort liability, but because the incompetent performance of decision-making activity of this nature by a governmental agency is not the subject of tort liability.

*Id.* But, in *Ashby*, the Court of Appeals held that city police officers were not entitled to immunity based on their failure to, *inter alia*, serve an arrest warrant in a domestic violence situation which resulted in the decedent being

murdered by her estranged partner. 841 S.W.2d at 185-86. The *Ashby* Court reasoned that "[a]lthough police officers certainly investigate facts, their duties do not include regulatory functions such as those involved in *Bolden, supra,* including the holding of hearings, the weighing of evidence, or the exercise of judicial discretion and adjudication of parties' rights." *Id.* at 188. Significantly, the Court rejected the officers' reliance on KRS 65.2003(3)(b) to argue that their "failure to enforce any law" was an example of a type of claim that was immune from liability. *Id.* The court reasoned that "[t]hat example clearly applies only to situation which **arise out of** 'the exercise of judicial, quasi-judicial, legislative or quasi-legislative authority," and not to those which arise out of the exercise of other types of authority." *Id.* (emphasis added).

Based on the foregoing discussion, the legal standards applicable in this case are clear. It is crucial to note as a threshold matter that municipal immunity is a very different animal than sovereign immunity. Sovereign immunity "is an inherent attribute of a sovereign state that precludes the maintaining of any suit against the state unless the state has given its consent or otherwise waived its immunity." *Yanero v. Davis*, 65 S.W.3d 510, 517 (Ky. 2001). Stated differently, because sovereign immunity inherently belongs to the Commonwealth by virtue of its existence, the presumption is that it always applies unless it is explicitly waived by our General Assembly. *See* Ky. Const. §§ 230, 231. But municipalities do not share in the Commonwealth's inherent immunity, and municipal immunity is instead wholly a creature of judicially made law. It is thus the inverse of sovereign immunity: we start from the

31

presumption that municipal immunity is not applicable, and a municipality must prove its entitlement to it. In addition, our case law demonstrates that municipality has never been entitled to immunity against a claim that it negligently maintained or repaired its sewer or water system. And, finally, entitlement to immunity only arises in the limited and narrow circumstances wherein a municipality "takes upon itself a regulatory function,' . . . which is different from any performed by private persons or in private industry, and where, if it were held liable for failing to perform that function, it would be a new kind of tort liability." *Gas Service*, 687 S.W.2d at 149.

To support her claims before the circuit court, Albright primarily relied upon the expert opinions and peer-reviewed report of Dr. Andrew Earles, P.E., D.WRE. In his report, Dr. Earles discussed that the amount of rainfall that occurred on August 31, 2018, corresponded to an approximately "1-year storm event," i.e., an amount of rainfall that could be expected at least once a year in the area in which it occurred. Dr. Earles explained that

> the depths and velocities in the swale were modest and in a range that generally would present a relatively low hazard. However, closer to the pipe entrance, depth and velocity increased, and once [David's] body began to enter the pipe and obstruct flow, the forces acting on him increased substantially due to the blockage.

He calculated the forces of the water based on its depth at the time of the incident and concluded that, once David's body began to obstruct the pipe entrance, the water would have exerted approximately six hundred and sixty

32

pounds of force against his body.[16] He deduced that "[t]he average layperson would not have been expected to know this to be a hazardous situation based on the depth and velocity of runoff in the swale." Moreover, the drainage pipe itself is not a simple culvert that spans a few feet from one end to the other: from its entry point to its exit into a detention pond, this pipe runs for four hundred and thirty feet—well over the full length of a football field—completely underground, including two ninety degree turns, with absolutely no means of escape.

Albright alleged that the pipe's inherent dangerousness was compounded by its location: both the swale and the opening of the pipe are in a residential area. The swale runs through the backyards of no less than six homes within the same subdivision, and the entrance to the drainage pipe is likewise in the backyards of three plots. Yet nothing about the pipe itself or a warning sign, indicated the level of danger it posed during a rain event and there was nothing covering its entrance, such as a grate, that would prevent an individual from being swept into it.

The record further demonstrated that MSD had knowledge that this pipe was in a residential area where children were present; although, given David's stature of five foot nine and 162 pounds, we do not mean to imply that this pipe could not also be dangerous to an adult. The record contains no less than

---

[16] Dr. Earles conducted the same calculations with the assumption that a grate had been placed over the pipe and that David's body became pinned against the grate. This resulted in the water exerting a force of only 20 pounds.

fourteen MSD service requests spanning from January 1995 to April 2018 showing that MSD was in this subdivision many times over the course of several years. One service request, dated January 1995, listed a complaint made by a customer living at 806 Foxfire Drive as follows: "Caller states the drainage ditch runs between several houses in the rear of the address then goes underground. Caller is requesting MSD place grate over the drain where it goes underground as several children play in this area." MSD's response to that complaint was to send the customer a form letter stating its practice of not installing grates over pipes.

A service request from March 1995 shows a complaint from a resident living at 801 Foxfire Drive about a "cave-in" that occurred next to a catch basin. The customer was "requesting the area to be secured ASAP due to children in the area." Years later, in May 2010, a resident at 804 Foxfire Drive filed a service request stating that 10-15 basketballs were in a catch basin on the street in front of their home. The resident noted "this is not the first time that kids have gotten into the basin and have placed 10-15 basketballs down the sewer line. . .customer requests that the grate be tar (sic) or caulked down."

Finally, Dr. Earles provided and discussed excerpts from several industry publications including the 1992 American Society of Civil Engineers (ASCE) and the Water Environment Federation (WEF) *Manual of Practice* which directed:

> The engineer is obligated to consider the advantages and disadvantages of debris racks on a case-by-case basis.

34

. . .

> Culverts normally run short distances beneath roads, railroads, etc. In cases where drainage ditches transition to drainage pipes that run for hundreds or even thousands of feet (common in the Midwest), a safety rack at the pipe entrance is recommended because of the consequences of debris blockage within the pipe and for public safety.

It was Dr. Earles' opinion that MSD's no-grate guideline was "out of date and inconsistent with the national standard of practice[,]" "contrary to the protection of public health, safety and welfare[,]" and "ignorant of modern design criteria for safety grates and the widely accepted fact that a properly designed safety grate actually decreases flood risk[.]"

Thus, Albright alleged that MSD failed to fulfill its ministerial duty to non-negligently maintain and repair the drainage system at issue and presented evidence to support her claim that the drainage system constituted an unreasonably dangerous condition created by MSD, that MSD knew or should have known of the dangers the pipe posed to the public, that the dangers the pipe posed would not be readily apparent to a layperson, and that MSD's stance on the use of grates was inconsistent with long-standing industry standards.

Based on the discussion of our jurisprudence *supra*, it has clearly always been the law of this Commonwealth, since well before *Haney* and continuing long after CALGA, that entities such as MSD have a ministerial duty to non-negligently maintain and repair the sewer and water systems for which they are responsible. Albright's allegation that MSD failed to fulfill that duty is precisely the type of claim that we have long held may subject a municipality to liability.

35

A jury may or may not agree with Albright's assertion that MSD's failure to place a grate or warning signage was a negligent failure to satisfy its ministerial duty, but such a claim must nevertheless go to a jury. The circuit court's summary judgment in favor of MSD on the basis that it was immune was accordingly error.

**2) MSD's decision not to install a grate and/or warn of potential dangers was not an exercise of its legislative, judicial, quasi-legislative, or quasi-judicial authority.**

The circuit court further erred in finding that the no-grate guideline relied upon by MSD arose out of MSD's exercise of its legislative or quasi-legislative authority. As discussed, that conclusion would require a finding that the MSD "'[took] upon itself a regulatory function,' . . . which is different from any performed by private persons or in private industry, and where, if it were held liable for failing to perform that function, it would be a new kind of tort liability." *Gas Service*, 687 S.W.2d at 149. Providing sewer and water services may be a regulatory function, but it is not a function that could not be performed by a private industry. It is therefore a clearly distinguishable function from, for example, the enforcement of laws and regulations establishing safety standards for the construction and use of buildings held to be immune in *Grogan*, or the enforcement of a city's housing code held to be immune in *Bolden*. *Grogan*, 577 S.W.2d at 5; *Bolden*, 803 S.W.2d at 581. Furthermore, if MSD were held liable for failing to non-negligently perform that regulatory function it would not "be a new kind of tort liability." *Gas Service*, 687 S.W.2d at 149. Rather, it would be the nearly ancient basis for tort

36

liability that we have discussed *ad nauseum* herein: the failure of a municipality to maintain and repair its sewer systems.

None of MSD's assertions to the contrary convince us otherwise. MSD argues, citing KRS 65.2003(3)(a), (d),and (e), that "in the absence of any governing legal or industry minimum standards governing the use of grates over stormwater drainage pipes" it "determined how to use its limited resources considering the competing demands and public safety risks" and "adopted a rule implementing its decision and did not make an inspection of the pipe at issue consistent with that rule."

To begin, it is true that the General Assembly has not passed a statute mandating that grates be placed when certain risk factors are present. But that does not absolve MSD of its duty to consider doing so in some cases. As we have discussed extensively herein, municipalities have had a ministerial duty for over 100 years to ensure that their sewer systems are properly maintained and repaired.

Next, MSD has consistently argued that it exercised its discretionary rulemaking authority over its sewage and drainage systems to create the guideline at issue. The two primary documents it relies upon are its Design Manual and its Drainage Manual. The "Introduction" section to the Design Manual explicitly states that its purpose is to be "a guide for the planning and design of storm water systems. . . for [MSD]" and further states that "[t]he guidelines and general design procedures in this manual are approved by the MSD Board." MSD argues that the Design Manual does not require the use of

37

grates over culvert pipes, but it fails to acknowledge that it does not *forbid*

them either. In fact, the entirety of the Design Manual's guidance on culvert

pipes states:

> **10.3.3. Culverts**
>
> **10.3.3.1 Design Methodology/Design Storm**
>
> > A method as described in the Kentucky Transportation
> > Cabinet <u>Drainage Guidance Manual</u> should be used.[17] The
> > design methodology used must be submitted for review.

Rather, it is MSD's *Drainage* Manual that forbids the use of grates; again, it

states that "MSD will not place grates on any existing drainage systems, or

allow their use in newly installed drainage systems where the potential for

flooding damage or a safety hazard exists." But, unlike the Design Manual, the

Drainage Manual was not approved by MSD's Board: the manual itself contains

no statement that it was approved by MSD's Board, and the deposition

testimony of David Johnson, MSD's Storm Water Services Director, made it

clear that the guidance contained within the Drainage Manual is *not* MSD

"policy" adopted by its Board.[18]

---

[17] It does not appear that the Transportation Cabinet's *Drainage Guidance Manual* was included in this voluminous record.

[18] He testified:

Q: And you wouldn't [place a grate for safety reasons] because this is your standard policy for throughout the whole county?

A: I wouldn't call it a policy. It's a practice guideline.

Q: Okay. And—

A: And the reason I don't call it a policy is because policies are board approved. And we don't have a whole lot of policies. The polices are a higher level, and then there's all these documents that go underneath

Molly Jones, a former MSD employee, explained the nebulous origin of the no-grate guideline in her deposition. In 1994 or 1995 she was contracted by MSD's Director of Engineering to put together a comprehensive manual that would explain to MSD employees how they should make decisions for the stormwater drainage program. Up to that point, MSD did not have such a document which in turn led to inconsistencies in how MSD employees were addressing various issues. The Drainage Manual was created solely to create consistency in the MSD employees' decision-making process. To compile the Drainage Manual, Jones met every week with six to seven people representing different MSD departments. The group that met did not create the guidelines themselves, rather, they simply wrote down the "best practices" that MSD had already been following. Jones further testified, contrary to MSD's assertion, that the purpose behind the no-grate guideline was not to create a blanket rule for which no exception was ever made:

> Q: But you don't—you did not intend to draft a blanket rule stating that a safety grate shall never be utilized, did you?

---

those policies, but each policy—I mean, each procedure or guideline or practice that we do aren't necessarily board approved.

Q: Okay. So would—well, let me start at the beginning. First, there is no policy with regard to when grates should be placed over storm drain pipes.

A: There's no policy.

Q: Right.

A: That's correct.

Q: Okay. And no request for such a policy has ever been presented to the MSD board for its consideration?

A: Not to the best of my knowledge.

A: I mean, no, because as with any one of these, you could always go in and give it a particular case review.

Q: Right. And this provision was not drafted with the intent of preventing that type of independent review was it?

A: No. Nothing in here was intended to prevent a review. And maybe that review happened. I don't know.

. . .

Q: Was the [guideline] intended to exclude MSD from exercising discretion in the utilization of the grate over a drainage pipe where the situation was such that the safety of children was significant and the possibility of flooding was minimal?

A: I would only answer that the [guideline] never precluded MSD from using discretion, period. I'm not going to add any other little factors in there. This didn't preclude them from exercising discretion.

MSD also asserts that its no-grate guideline was based on two discretionary considerations: one, its limited resources, and two, that the placement of grates causes an increased risk of flooding. On that point we only note that the Drainage Manual itself clearly refutes MSD's claim that its guideline was arrived at based on a consideration of its limited resources. Section II of the Drainage Manual, which contains the guideline against placing grates, has an "Introduction" paragraph which states:

> MSD's responsibility as a stormwater utility is based on its responsibility to deal with problems involving public water in its drainage service area. In filling this role, MSD has developed Principles to be used when reviewing drainage service requests to determine whether MSD should accept responsibility for addressing a particular drainage service need. . . .

> Although these Principles address MSD's responsibility within the drainage program, **they do not speak to resource constraints,**

40

> **and MSD's ability to address any request or type of request within a particular time frame.** *These Principles have intentionally been drafted so as to be blind to MSD resource levels.* It is MSD's position that accepting responsibility for a drainage need is foremost; resource constraints come into play in establishing the timing of the request resolution. A method for establishing the timing of request resolution has been developed and **must** be used in conjunction with these Principles. The method is included in the section of this manual entitled "Prioritization of Requests."

(Bolding in original, italicization added). The guideline was therefore clearly not adopted based on a consideration of MSD's resources, as the very document that contains the guideline states that it was "drafted so as to be blind to MSD resource levels" and that "resource constraints only come into play in establishing the timing of [a] request resolution."

Finally, MSD asserts that it did not make an inspection of the pipe at issue because of its no-grate guideline. MSD was given authority over its systems in 1986 pursuant to an interlocal agreement between the City of Louisville and the Fiscal Court of Jefferson County. That interlocal agreement was later adopted essentially verbatim under Chapter 50 of the Louisville-Jefferson County Metro Government's Ordinances. Given that MSD claims it had the discretion not inspect the pipe at issue based on its non-Board adopted guideline, two sections from that ordinance are notable:

§50.71 RESPONSIBILITY FOR DRAINAGE SERVICES.

MSD shall have responsibility for operation and maintenance of public storm drainage facilities. . . including, but not limited to:

. . .

41

B. **MSD shall monitor the design, operation, maintenance, inspection, construction and use of all** storm sewers, **storm drains, and storm water facilities** in the drainage service area. MSD shall have exclusive jurisdiction for the design and construction of public storm water facilities in the drainage service area **and shall inspect, operate and maintain such facilities**.

. . .

§ 50.72 ROUTINE AND REMEDIAL MAINTENANCE.

**MSD shall provide for inspection and routine maintenance of storm and surface water drainage facilities**. Maintenance may include catch basin cleaning, grating, and casting repair, inlet and outlet structure repair, channel clearing, erosion repair, and other incidentals. **MSD shall provide for remedial maintenance of facilities based upon** the severity of Storm Water problems and **potential hazard to the public**.

(Emphasis added). Thus, in addition to the ministerial duty imposed under the common law and CALGA, the very documents that establish MSD's authority over its sewage and drainage systems impose upon it a mandate to monitor and inspect its storm water facilities and provide "remedial maintenance" if those facilities pose a "potential hazard to the public."

In sum, there is simply nothing in this record, the common law, or CALGA that convinces this Court that MSD should not be subject to liability for its alleged negligent failure to properly maintain and repair the drainage system at issue.

At least one other state supreme court, Florida's, has reached a similar conclusion to the one we reach herein. Like Kentucky, Florida generally distinguishes between ministerial duties and discretionary acts for the purposes of determining whether the government is immune for its acts or

42

omissions, though it utilizes the term "operational-level functions" instead of ministerial duties and the term "planning-level functions" instead of discretionary acts. *See Commercial Carrier Corp. v. Indian River Cty.*, 371 So. 2d 1010, 1021-22 (Fla. 1979).

The Supreme Court of Florida applied these doctrines to facts that are substantially similar to the ones we confront in this case in *City of St. Petersburg v. Collom*, 419 So. 2d 1082 (Fla. 1982). In *Collom*, the plaintiff's wife and daughter were walking across private property during a heavy rainstorm and "unknowingly stepped into a storm sewer drainage ditch located on a city drainage easement, and were sucked into a pipe and drowned." *Id.* at 1084. The plaintiff filed a wrongful death action against the city alleging that the "city failed to guard the opening to the storm sewer by failing to place screens, bars, or other protective devices" over the opening of the pipe and that the city further "failed to warn of a hazardous condition so that human beings would not be dragged into the sewer during heavy rains and storms." *Id.* The trial court granted summary judgment for the city, and the Second District Court of Appeal reversed. *Id.*

Before the Florida Supreme Court, the city asserted that the "adoption of a drainage system plan entails judgmental, planning level decisions on the part of government officials who designed the system" and that "decisions concerning when and in what manner to build a drainage system should not be subject to second-guessing by a judge or jury." *Id.* The plaintiff argued in response that "once the city's decision-making process is complete, liability

43

may attach to the manner in which such plans are implemented" and that "once the city had notice of the hazardous condition. . . an operational-level function arose, requiring the city to remedy or give notice of the hazard, and its failure to do so establishes liability." *Id.*

Florida's highest court agreed with the plaintiff, noting that "defects in the overall plan for an improvement, as approved by the governmental entity, are not matters that in and of themselves subject the entity to liability[,]" and therefore "[t]he judicial branch can neither mandate the building of expensive and fail-safe improvements, nor otherwise require expenditures for such improvements." *Id.* at 1085-86. Nevertheless, the Court concluded that "without substantially interfering with the governing powers of the coordinate branches, courts can require: (1) the necessary warning or correction of a *known* dangerous condition; (2) the necessary and proper maintenance of existing improvements. . . and (3) the proper construction or installation and design of the improvement plan." *Id.* at 1086. Accordingly, the *Collom* Court held that:

> **once a governmental entity creates a *known* dangerous condition which may not be readily apparent to one who could be injured by the condition, and the governmental entity has knowledge of the presence of people likely to be injured, then the governmental entity must take steps to avert the danger or properly warn persons who may be injured by that danger. The failure of government to act in this type of circumstance is, in our view, a failure at the operational level**. We find that a governmental entity may not create a known hazard or trap and then claim immunity from suit for injuries resulting from that hazard on the grounds that it arose from a judgmental, planning-level decision. When such a condition is knowingly created by a governmental entity, then it reasonably follows that the

44

governmental entity has the responsibility to protect the public from that condition, and the failure to so protect cannot logically be labelled a judgmental, planning-level decision. We find it unreasonable to presume that a governmental entity, as a matter of policy in making a judgmental, planning-level decision, would knowingly create a trap or a dangerous condition and intentionally fail to warn or protect the users of that improvement from the risk. **In our opinion, it is only logical and reasonable to treat the failure to warn or correct a known danger created by government as negligence at the operational level.**

. . . To illustrate, if a governmental entity plans a road with a sharp curve which cannot be negotiated by an automobile traveling more than twenty-five miles per hour, the entity cannot be liable for building the road because the decision to do so is at the judgmental, planning level. If, however, the entity knows when it builds the road that automobiles cannot negotiate the curve at more than twenty-five miles per hour, then an operational-level duty arises to warn motorists of the hazard.

*Id.* (internal citation omitted) (emphasis added).

We see no reason why the principles established by the *Collom* Court should not have equal application in the Commonwealth. MSD cannot be permitted to place or leave be an allegedly unreasonably dangerous drainage system in a location where it will inevitably be encountered by the public, do nothing to warn or protect the public against its dangers, and then cloak itself in municipal immunity by claiming that its decision not to protect or warn the public was the result of its exercise of its legislative or quasi-legislative authority. If this Court were to adopt MSD's reasoning that it is entitled to municipal immunity simply because it made a decision, then it is difficult to envision a circumstance when a municipality could *ever* be subjected to liability for its alleged negligence. This, in turn, would regress our

45

jurisprudence back into a place we have been trying to avoid since *Haney* in which immunity is the rule and liability is the exception.

## III. CONCLUSION

Based on the foregoing, we affirm the Court of Appeals' holding that MSD is a "local government" under CALGA and further affirm its holding that MSD is not entitled to municipal immunity from Albright's claims under CALGA, as the alleged negligent acts are ministerial in nature. We hereby vacate the Jefferson Circuit Court's opinion and order granting summary judgment in favor of MSD and remand for further proceedings.

All sitting. Goodwine, J.; concurs. Keller, J. concurs in result only by separate opinion, in which Thompson, J., joins. Thompson, J.; concurs in result only by separate opinion. Conley, J., concurs in part and dissents in part by separate opinion, in which Bisig and Nickell, JJ., joins.

KELLER, J., CONCURRING IN RESULT ONLY: I agree with much of the Majority's well-written opinion—chiefly that MSD is a "local government" within the meaning of KRS 65.200(3), and that it is *not* entitled to statutory immunity pursuant to CALGA in this instance. *See* KRS 65.200–2006. I write separately, however, to clarify—for the bench, bar, and the General Assembly—what I believe to be the proper analytical framework for assessing claims of immunity under CALGA. Whether MSD had any so-called "ministerial" obligation here is of no import. Rather, MSD is not entitled to immunity from Albright's claims because its decision to forgo the installation of a grate on the drainage pipe

near Albright's home is not the kind of "judicial, quasi-judicial, legislative or quasi-legislative" decision immunized by CALGA.

As the Majority aptly recognizes, it was this Court that first created and determined the bounds of the common law doctrine of municipal immunity. In 1988, however, the General Assembly supplanted and codified our previous holdings with its enactment of CALGA. I agree with the Majority that the General Assembly likely did not intend to drastically alter the then-existing doctrines of municipal immunity and liability by enacting CALGA. That does not mean, however, that this Court is free to analyze claims of *statutory* immunity under CALGA without adhering to the plain text of CALGA's provisions.

To determine whether a "local government" is statutorily immune from tort liability pursuant to CALGA, the General Assembly has instructed that a court must consider whether the plaintiff's claim arises from the local government's "exercise of judicial, quasi-judicial, legislative or quasi-legislative authority or others, exercise of judgment or discretion vested in the local government[.]" KRS 65.2003(3). The Majority, while initially acknowledging this plain language, instead incorrectly asks whether the plaintiff's claim arises from the local government's alleged failure to fulfill some "ministerial" duty. According to KRS 65.2003(3), that is plainly *not* the correct standard by which to assess claims of statutory immunity under CALGA.

While the dichotomy between "ministerial" and "discretionary" acts is perhaps familiar to this Court, that framework has been reserved only for

47

assessing claims of common law "qualified official immunity" as applied to tort claims against government employees in their individual capacities—not tort claims directly against local governments themselves. *See, e.g. Haney v. Monsky*, 311 S.W.3d 235 (Ky. 2010); *Meinhart v. Louisville Metro Gov't*, 627 S.W.3d 824 (Ky. 2021). Indeed, the General Assembly expressly recognized that distinction in KRS 65.2003(3) when it wrote that, "Nothing contained in this subsection shall be construed to exempt a local government from liability for negligence arising out of acts or omissions of its employees in carrying out their ministerial duties." This portion of CALGA both acknowledges the doctrine of qualified official immunity, and ensures that local governments cannot escape *vicarious* liability for the negligent acts of their employees.

As aforementioned, the proper framework to assess whether a "local government" is immune from tort liability under CALGA is to ask whether the plaintiff's claim arises from the local government's "exercise of judicial, quasi-judicial, legislative or quasi-legislative authority or others, exercise of judgment or discretion vested in the local government[.]" KRS 65.2003(3). CALGA's plain text makes clear that the General Assembly intended to insulate municipalities and other local governments from tort liability arising from the types of high-level decisions that only local governments can make—those that are legislative or judicial in nature. Indeed, the purpose of municipal immunity is not to elevate *every* one of a municipality's routine decisions above scrutiny. If that were the case, virtually no act or omission could be the basis for liability, and

immunity would be the rule, not the exception. *Cf. Haney v. City of Lexington*, 386 S.W.2d 738, 742 (Ky. 1964).

Here, Albright alleges that MSD negligently designed, maintained, and constructed its storm drainage system in a manner that rendered it unreasonably dangerous. More specifically, Albright alleges that the installation of bars or grates over the system's drain pipes would have prevented her son's tragic death. However, the routine and ordinary design, construction, and maintenance of municipal infrastructure does not require the kind of "judicial, quasi-judicial, legislative or quasi-legislative" decisions immunized by CALGA. Indeed, deciding whether or not to install bars or grates over a particular drainage pipe does not implicate a municipality's inherent judicial or legislative authority; such an act does not require deliberation, debate, policymaking, or judicial reasoning. Accordingly, CALGA does not immunize MSD from Albright's claims sounding in tort.

In short, while the Majority reaches the correct result in this case, it does so while failing to employ the correct analytical framework to assess claims of statutory immunity pursuant to CALGA. Whether Albright's claims arise from MSD's alleged failure to fulfill its so-called "ministerial" duties is of no importance. Accordingly, I concur in result only.

Thompson, J., joins.

THOMPSON, J., CONCURRING IN RESULT ONLY. I concur with the majority opinion that local, municipal, quasi-governmental entities like the Louisville & Jefferson County Metropolitan Sewer District (MSD) are not

49

immune under the Claims Against Local Governments Act (CALGA) from liability when they are negligent in the construction, maintenance or repair of the facilities, properties or projects which fall within their control.

I write separately, however, because I do not believe the majority opinion goes far enough in drawing a clear, binary, distinction between when municipal or quasi-governmental entities are immune from liability for activities within their discretionary "legislative or quasi-legislative authority" and, contrastingly, when they are liable for injuries caused by their actions or decisions. Kentucky Revised Statutes (KRS) 65.2003.

I consider MSD's inaction here, in deciding to create a policy, wherein it would refuse to ever consider putting a grate on this particular inlet pipe or *any* drainage system, to have been a clear derogation of, and complete abandonment of, all of its duties and constitutes reckless conduct for which it cannot be absolved of responsibility or accountability.

In his concurring opinion in *Caneyville Volunteer Fire Depart. v. Green's Motorcycle Salvage, Inc.*, 286 S.W.3d 790, 813 (Ky. 2009), Chief Justice Minton described the doctrine of sovereign and governmental immunity as a "difficult area of law, full of rules and subsets" in which he was "compelled to say that we should endeavor to drain this judge-made swamp." That is as true today as it was sixteen years ago.

This present circumstance calls for a "brighter line" in our decision-making and MSD, albeit unintentionally, offers one. The line I propose is this: When a municipal agency makes decisions which *create* unreasonably and

50

objectively hazardous conditions for citizens, and which naturally result in death, then such decisions cannot be granted immunity because they are allegedly "the exercise of. . . legislative or quasi-legislative authority" under any statutes including CALGA.

The logic underlying such "line" of demarcation is simple: Our General Assembly could never have intended for CALGA to grant immunity to local governments for decisions which *create* (instead of attempt to regulate) hazards to our citizens or evince a wanton or reckless disregard for the lives of the citizens of the Commonwealth.

In this case MSD has argued when it made the decision to publish guidelines in its Drainage Manual to "not place grates on any existing drainage systems, or allow their use in newly installed drainage systems where potential for flooding or a safety hazard exists[,]" it was exercising discretionary authority in its role as a "local government" under CALGA. In sum, even if it was wholly negligent, MSD argues that it is immune because it *made the decision* to be negligent. As stated in *Bolden v. City of Covington,* 803 S.W.2d 577, 581 (Ky. 1991): "The principle of no liability . . . does not rest upon tort immunity but upon the fact that the *incompetent performance of judicial and legislative acts* is not classified as actionable negligence in the tort system." (Emphasis added).

The standard for liability I now propose has roots in this Court's earlier decision in *Gas Service Co., Inc. v. City of London,* 687 S.W.2d 144 (Ky. 1985). That opinion presciently noted that our caselaw, to date, concerned itself with injuries caused by a regulatory failure to *prevent* an injury, rather than a

51

governmental action which directly *caused* an injury which is what MSD has done. In *Gas Services* the Court noted, "[i]n these cases[19] the government was *not charged with having caused the injury*, but only with having failed to prevent it by proper exercise of regulatory functions which have elements appearing quasi-judicial and quasi-legislative in nature." *Id.* at 149 (emphasis added).

In the matter before this Court, MSD created, controlled and maintained the very structure which, as alleged by Albright, was "inherent[ly]" and "unreasonably" dangerous. The pipe into which young David was swept was not a common drainage pipe. It is not an exaggeration to describe the system into which David was sucked as a "death trap." I would add that MSD's policy to *never* place grates on drainage system — regardless of repeated warnings and regardless of the extreme hazard and probability of death some of its pipe inlets pose — demonstrates such an extreme and wanton indifference to human life that it cannot be considered to have been the result of any "discretionary" governmental decision making. MSD's policy means that it has taken the position that no matter how much information it has about how dangerous one of their pipes may be during and after a period of rainfall, it

---

[19] *Com., Dept. of Banking & Securities v. Brown*, 605 S.W.2d 497 (Ky. 1980) (holding that the Commonwealth was not liable for the dereliction of its bank examiners in the performance of a regulatory function); *Grogan v. Commonwealth*, 577 S.W.2d 4 (Ky. 1979) (holding that the city of Southgate, Kentucky could not be held liable for the deaths resulting from the Beverly Hills Supper Club fire which were arguably a result of the city's failure to enforce laws and regulations establishing safety standards for construction and use of buildings).

refuses to ever even consider taking any remedial action, such as installing grating or posting warning signage. Despite David's death clearly establishing the danger this pipe poses to human life, MSD argues its policy justifies a permanent rejection of taking any corrective action.

I find MSD's excuses for this uniform policy to be so absurd as to not merit consideration as quasi-legislative. MSD asserted that during heavy rainfall debris may build up at grate coverings and cause flooding. However, it is certainly easier to remove debris from grates *outside* the storm water system than having to remove debris from deep within pipes and underground basins. What its policy, in effect, means is that MSD would rather risk people dying than to pay employees to inspect and clear grated storm water pipes. In *Hilen v. Hays*, 673 S.W.2d 713, 718 (Ky. 1984), this Court stated: "To those who speculate that [it] will cost more money . . . we say there are no *good* economies in an *unjust* law." (Emphasis in original). Such reasoning applies here as well. Outright, and knowing, disregard for the lives of citizens cannot be countenanced as either a discretionary or regulatory function entrusted to a municipal entity under CALGA when the only excuses one can find boil down to saving a few dollars.

I must also take issue with the notion that a "hard and fast" uniform policy like MSD's no-grates rule can be considered "discretionary" in this legal context. The record in this case does not evidence MSD considering *any* of the unique and dangerous characteristics of the drainage pipe into which David was swept or the deadly nature of the structures existing after the inlet. The

53

dangers posed by this particular structure was not even considered by MSD under its policy of "a pipe is a pipe." MSD maintains maps and schematics for all their systems in Jefferson County and should be able to readily identify flood-prone areas and those storm sewer inlets that pose a danger of death to the public during rainfalls.

"Discretion" *must* include at least some consideration of unique circumstances. MSD did not partake in *any* discretionary function regarding this system. We have consistently ruled that discretionary acts involve "the exercise of discretion and judgment, or personal *deliberation, decision, and judgment*[.]" *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001) (emphasis added).

When entities like MSD expect broad protections from liability, there is an implication that the Commonwealth has afforded them that luxury because the decisions they make, on matters in which they are specialists, should not later be second guessed by ill-informed courts and juries. Decisions on the proper safety precautions to be taken regarding flooding and drainage are ones which inherently require conscious evaluation of risks, alternatives, and entail significant judgment. The decisions made in such an environment are discretionary. When no such deliberations are conducted, we have a wholesale abandonment of discretion and immunity should not be granted.

Amongst the definitions of "discretion" are "the quality of having or showing discernment or good judgment" and the "ability to make responsible

decisions."[20] When there has been no "judgment" exhibited or "decision" made regarding the significant risk of death posed by this particular drainage system, there has been a wholesale abandonment by MSD of its duties. When MSD discusses costs and maintenance issues attendant to its decision to never install grates, it evidences a complete failure to consider the attendant risks to human life when grates are not present at structures where death is the natural outcome of a grate's absence.

Accordingly, I concur with the majority's ultimate result, but I respectfully assert that we can go further in clarifying standards that both properly limit the breadth of immunity available under CALGA and are easier to grasp by both our courts and the affected entities.

CONLEY, J., CONCURRING IN PART AND DISSENTING IN PART. Respectfully, I dissent. The loss of a child is a tragedy, and since ancient times it has been understood as evil that a parent should ever bury their child, as it is in an inversion of Nature. Herodotus, *The History* 74 (Grene, David, trans.) (University of Chicago Press 1987). I am quite sympathetic to Jennifer Albright's loss, but I cannot agree that the Metropolitan Sewer District (MSD) is not entitled to immunity. I concur with the Court that CALGA applies to MSD, but I disagree with its conclusion that MSD violated a ministerial duty to keep the sewer in good repair. Instead, I conclude MSD exercised its discretionary decision-making power and elected not to install grates on its sewers because it

---

[20] *See Discretion*, Merriam-Webster Dictionary, https://www.merrian webster.com/dictionary/discretion.

determined such a practice would alleviate flooding. In brief, there was a choice made between two practices, each of which could lead to bad results. That is quintessentially a legislative or quasi-legislative exercise of power. Therefore, I conclude MSD is entitled to municipal immunity under CALGA.

CALGA provides immunity from claims "arising from the exercise of judicial, quasi-judicial, legislative or quasi-legislative authority or others," including those scenarios "when in the face of competing demands, the local government determines whether and how to utilize or apply existing resources[.]" KRS 65.2003(3)(d). The Court relies upon Albright's expert, Dr. Andrew Earles, to suggest MSD's practice is contrary to industry standards or outdated. At the trial court and to this Court, MSD points to its drainage manual to illustrate that placing safety grates on drainage pipes is a policy decision. In the introduction of the drainage manual, it emphasizes the problem of flooding in Jefferson County and the area it is responsible for. Quoting from the manual:

> When MSD assumed the responsibility for our community's public drainage system in 1987, it inherited a large backlog of problems that had been accumulating for more than 200 years, and have been accelerating rapidly since World War II. Some problems are a natural part of Jefferson County's geography: Numerous areas were previously swamplands, and many of the hilly areas dump torrents of water into our streams during heavy rains. In fact, many of the County's areas should never have been developed for homes and businesses. MSD has studied these problems in depth.
>
> Unfortunately, our community still has homes that are flooded during heavy rains and entire neighborhoods that do not have any effective drainage systems. MSD is focusing its limited resources on resolving the most serious and widespread problems first, based on engineering studies, community priorities and available funds.

56

MSD has undertaken extensive drainage improvement projects to deal with the worst of these problems.

MSD emphasizes in this introduction that it operates in a flood prone environment with limited resources. Specifically, to the issue of safety grates, the drainage manual provides: "MSD will not place grates on existing drainage systems, or allow their use in newly installed drainage systems where the potential for flooding damage or a safety hazard exists." The fact that the MSD Board never formally adopted this as policy is a trifle compared to the consistent practice of MSD these last forty years. The MSD Board obviously knew and approved of the practice. Nor is the Court's holding that this practice was not justified by resource allocation conclusive, since KRS 65.2003(3) states its list "shall include by example, but not be limited to . . . ." Therefore, KRS 65.2003(3) is non-exhaustive, and the pertinent question is whether the challenged action is legislative or quasi-legislative.

As explained by David Johnson—who, at the time of his deposition, was MSD's Chief Engineer, and formerly MSD's Development and Stormwater Services Director—

We don't allow those [safety grates] in our system. We don't put grates in front of pipes. . . . It's just a common practice. It's a practice that we don't do, and we do it because they lead to blockages, which leads to flooding. Flooding leads to damaged properties, it leads to safety risks for people around the flooded area, at least the flooded roadways. It leads to risks for our employees to have to go out there and clean those. It also leads to a risk even for the customers because a lot of times when customers see a system backing up with water, they want to go in there and clean it out themselves. They take that responsibility out. So that's – that's why we don't have those grates in front of systems is because they lead to blockages, which lead to flooding.

57

Thus, MSD confronted an inherently legislative or quasi-legislative decision: should grates be installed, thereby securing the safety of those persons who may be endangered by coming too close to the drainage pipes? Or not install grates, to alleviate the potential dangers and costs of flooding? The Court has cited several other pieces of evidence from MSD that would purport to negate my conclusion. But all the Court has demonstrated to my mind is that the decision is a multifaceted one without any precise legal or industry guidance. That only confirms the issue is one of a legislative or quasi-legislative character; hence, purely discretionary and subject to CALGA's cloak of immunity.

Finally, the Court's conclusion is further undermined by its analysis of case law. The Court clearly approves and reaffirms the decisions of *Mason v. City of Mt. Sterling*, 122 S.W.3d 500 (Ky. 2003) and *City of Frankfort v. Byrns*, 817 S.W.2d 462 (Ky. App. 1991). Therefore, the practical result of today's decision will be that a grate is going to be installed over the drainage pipe where David Albright died. Undoubtedly, several other grates will be installed at numerous other locations throughout MSD's coverage area, but it is also likely that grates will not be installed in several potential areas where one could be. MSD is now going to be potentially liable for every one of those decisions. Where a safety grate is installed and flooding results, the residents of the area effected will have a viable claim against MSD for negligent maintenance and repair of the sewer system. Where a safety grate is not installed—and should

58

another individual die in a similar manner to David Albright—then that person's family and the deceased's estate will have claims against MSD for negligent maintenance and repair of the sewer system. It is a classic "damned if you do, damned if you don't" situation.

CALGA's cloak of immunity for legislative and quasi-legislative decision-making is tailored precisely for such circumstances. Legislative decision-making inherently involves consideration of any number of factors and interests, several or all of which could need expert advice, and all of which must be balanced and weighed, with any decision made having the potential for adverse outcomes. As CALGA states, there can be no claim against a local government when the action taken is legislative or quasi-legislative in nature. KRS 65.2003(3). As Justice Wintersheimer said, "[t]he only valid exercise of government which should be exempt from tort liability is the purely administrative or legislative decision-making process." *Gas Serv. Co., Inc. v. City of London*, 687 S.W.2d 144, 151 (Ky. 1985) (Wintersheimer, J., concurring). That is what we have here. It is lamentable that David Albright perished, but how many homes were spared, how many lives were uninjured or even saved from flooding, by the decision not to install the grate? That is the other side of the balancing scales which the Court wholly ignores, but one which local governments cannot. In weighing the scales and making a decision, it is an unfortunate reality that sometimes evil but unintended consequences occur—nevertheless, "it is not a tort for government to govern." *Yanero v. Davis*,

65 S.W.3d 510, 519 (Ky. 2001) (quoting *Dalehite v. United States,* 346 U.S. 15, 57, 73 S.Ct. 956, 979, 97 L.Ed. 1427 (1953) (Jackson, J., dissenting)).

Thus, I conclude CALGA intended to shield MSD from tort claims for decision making such as occurred in this case. I would hold MSD entitled to municipal immunity, reverse the Court of Appeals, and affirm the trial court

Bisig and Nickell, JJ., joins.

COUNSEL FOR APPELLANT:

John W. Bilby
Carolyn Christine Ely
Adam Tanner Goebel
Eric Michael Weihe
Stoll Keenon Ogden PLLC

Kenneth Williams, JR.
Williams, Hall & Latherow, PSC

Dustin Chadwick Haley
Kinkead & Stilz PLLC

COUNSEL FOR APPELLEE:

Leroy E. Sitlinger
Sitlinger Law

COUNSEL FOR AMICUS, KENTUCKY LEAGUE
OF CITIES:

Bryan H. Beauman
Sturgill, Turner, Barker & Moloney, PLLC

COUNSEL FOR AMICUS, SANITATION
DISTRICT NO. 1 OF NORTHEN KENTUCKY
WATER DISTRICT AND NORTHERN KENTUCKY
WATER DISTRICT:

Jeffrey Charles Mando
Adams Law, PLLC